**Barbara GILLEN, Plaintiff,**

v.

**Daryl GATES, et al., Defendants.**

**No. CV 91–6384 JSL.**

United States District Court, C.D. California.

March 11, 1994.

Stephen Yagman, Yagman & Yagman, P.C., Venice, CA, for plaintiff.

James K. Hahn, City Atty., Honey A. Lewis, Asst. City Atty., Los Angeles, CA, for defendants.

LETTS, District Judge.

### Plaintiff's Motion for Attorney's Fee

Before the Court is plaintiff Barbara Gillen's application for attorney's fees pursuant to 42 U.S.C. § 1988. This Court has not addressed the question of fees application under this statute since giving a complete exposition of its understanding of the relevant law in *Gomez v. Gates,* 804 F.Supp. 69 (C.D.Cal.1992). Juxtaposed against *Gomez,* this case shows how difficult it may be for district courts in § 1988 cases to arrive at fees which are truly "reasonable" through application of the "lodestar" analysis dictated by the Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

### 1. Facts

Upon her arrival at the Los Angeles airport after a trip from Phoenix, Arizona, plaintiff picked up her checked suitcase and started to depart. Before reaching the outside exit, however, plaintiff was stopped and searched by a female officer of the Los Angeles Police Department. The officer searched plaintiff's carry-on bag and also the checked suitcase, which was opened and searched in public view on the airport floor. During the search the female officer was joined by a male supervisor.

Before any actual search was started, plaintiff asked why she had been stopped, and was told, "Because you paid cash for your ticket." Plaintiff produced the ticket, which showed that the officer was in error, and that in fact the ticket had been pur-

chased on credit. Nevertheless, plaintiff was detained and searched by the two officers.

Plaintiff sued the two officers who had personally conducted the search. She also sued the Los Angeles Police Department, the Chief of Police and twenty six other individuals, on the theory that the search had resulted from an unlawful policy for which they were responsible. The Court bifurcated the case as between the searching officers and the other defendants.

The searching officers testified at trial that they had initiated the search after receiving a tip from law enforcement officers who had seen plaintiff board the airplane in Phoenix. The tip described plaintiff as a "suspected courier" and gave as the reasons for suspicion that plaintiff (1) had exhibited "nervous behavior," (2) wore a "glitter" jacket, (3) had arrived late to the plane, and (4) had paid cash for her ticket.[1] The female officer who initiated the search did so at the direction of the male officer who later joined in. She was not told of the "tip" and was not apprised of its specific content.[2]

The officers further testified that plaintiff had consented to the search. Plaintiff expressly denied having given any such consent, and the jury's liability verdict in favor of plaintiff indicates that the jurors believed plaintiff's version. Counsel asked only for nominal compensatory damages, and the jury accordingly awarded $1.00. The jury also awarded $3,000 in punitive damages individually against the two officers who had conducted the search and the Chief of Police.

Following the jury verdict against the officers, counsel proffered the testimony of two witnesses against the other defendants. The first was the male defendant officer, who would have testified as to his own prior acts. The second was an expert who would have testified that his research showed that the Los Angeles Police Department had received a large number of citizen complaints alleging unlawful searches by police officers, over a number of years, that none of the allegations had been sustained upon the department's internal investigation, and that there had been no disciplinary actions taken as a result of any of the complaints. He would then have testified that, in his opinion, some of the complaints must have been valid, and that the failure to sustain any of them, or to discipline any officers, showed a deliberate indifference to unlawful searches by the Los Angeles Police Department. The expert would then have offered his opinion that this deliberate indifference had led to the unlawful search of plaintiff.

The Court ruled that all of the proffered evidence, even if believed, would not show a *prima facie* case.[3] Plaintiff then stated that it had no other evidence to offer, and the Court granted defendants' motion for a directed verdict on the claims against them. As a result, plaintiff prevailed only on her claim against the searching officers.

## 2. Fee Request and Analysis of Prior Cases.

■ Plaintiff's counsel has requested fees in the amount of $80,000. Counsel bases this

---

1. Two of the three reasons for suspicion appear to have been false. Plaintiff, in fact, had purchased her ticket on credit, and she had arrived at the Phoenix airport not only in time for her to check her bag in the ordinary course, but also for her companion to park the car in which she had arrived and see her off on her flight.

2. The Court held that, even if they had been communicated, the specifics of the "tip" would not have produced a reasonable suspicion sufficient to justify stopping the plaintiff. The Court also held that because the officer making the stop was unaware of the articulated reasons for suspicion, and therefore could not have known that there was reasonable suspicion to support a search, the reasons articulated in the note, even if otherwise sufficient, would not have justified the stop.

3. The Court examined the expert on *voir dire* and established that the expert's information did not distinguish between searches resulting from tips and all airport searches generally. He also was unable to say that the percentage of unlawful searches as a percentage of total searches was abnormally high in Los Angeles compared with comparable areas. The Court noted that disciplinary actions often involve outright swearing matches between officers and complaining witnesses and are only one of many ways available to Police Departments to assure compliance with policy. The Court ruled that in the absence of any known or identifiable problem, the failure to believe complainants over officers and to use disciplinary procedures to enforce policy would not amount to deliberate indifference.

request on a "lodestar" computation of 202.5 hours expended on the case, times a fee rate of $400 per hour. Plaintiff urges, as support for this hourly rate, this Court's decision in *Gomez, supra.*[4]

In *Gomez,* this Court noted that it was obliged to follow the Supreme Court's decision in *City of Burlington v. Dague,* —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), although the Court itself did not subscribe to much of the reasoning or premises in that opinion.[5] The Court believes that the simple "lodestar" calculation, as apparently envisaged by the Supreme Court in *Dague, Id.* at ——, 112 S.Ct. at 2641, cannot be expected to produce a reliably "reasonable" attorney's fee in cases where the fee is sought under § 1988 and is, therefore, ultimately borne by the taxpayers.

Comparing the case at bar with *Gomez, supra,* provides a striking illustration. As this Court indicated in the *Gomez* opinion, in that case the role of the plaintiff's counsel as private attorney general was maximized. *Id.* at 78. The case involved fatal shootings by police officers who, at least until the shooting began, were operating in clear conformity with an established policy. Pursuant to this policy, before any shooting commenced, the officers followed previously identified suspects to the scene of a robbery, stopped other officers from responding to a 911 call, observed the robbery unfold, and then trapped the robbers in their car as they were leaving the scene. Claiming that one of their number thought he had seen one of the robbers leveling what turned out to be an inoperative toy pellet gun at him, the officers

fired approximately twenty shotgun rounds at the robbers, killing three of them, and seriously wounding the fourth. *Id.* at 70–71.

After a thirteen week trial the jury found that the shootings involved had not been in self-defense, but rather had involved an unconstitutional use of force. The jury found not only the shooting officers, but also the Los Angeles police chief, who had not been personally involved in the incident, liable both for compensatory and punitive damages. *Id.* at 71. Although the jury verdict did not clearly disapprove of the policy of allowing crimes to occur and victims to be victimized in order to catch criminals "in the act", the case did raise the issue in a way which required it to be considered and brought to public attention. As noted in the *Gomez* opinion, the Court believed the jury verdict of $44,000, spread among six plaintiffs, reflected the jury's reluctance to provide too substantial an award to people whose rights flowed from admitted wrongdoers. *See id.* at 75–76. Accordingly, in its *Gomez* opinion the Court suggested that there might be no other counsel in the greater Los Angeles area who could have devoted the time, effort and skill necessary to obtain that verdict. *Id.* at 78.

In this Court's view, the commonality of counsel is the only thing which *Gomez* had in common with the case at bar. The constitutional right asserted in this case, although also arising under the Fourth Amendment of the Constitution, can hardly be said to have equal dignity, either by reference to plain-

---

4. The actual rate approved by the Court in *Gomez,* as an alternative holding to a fee enhancement, was $350 per hour, which the Court considered appropriate because of the extraordinary skill and dedication necessary for counsel to prevail in that case. *Gomez, supra,* at 78.

5. The Court takes note of its own very substantial pre-bench experience as a commercial bills-paying client, and of its discussions with over a thousand institutional client representatives at settlement conferences in proceedings before it. Based upon the experience noted, the Court is firmly convinced that, in determining the amount of fees that they will actually pay, experienced clients look not to the lodestar calculation upon which most bills purport to be based, but rather to the reasonableness of the fee by reference to

fees in other matters deemed to be comparable. Such clients, do not even profess to believe that lawyers' time sheets are more than rough approximations of time spent on particular matters, and are well aware that few lawyers actually record time as it is expended. Such clients also understand that they have virtually no practical ability to analyze the *integrity* of time charges, much less to determine whether specific charges are reasonable. When a question is raised as to integrity, the solution is to find another lawyer. As to whether specific charges are reasonable, experienced clients look *first* to the bottom line to see whether the overall fee is reasonable. If it is, they pay the bill. If it is not, they challenge enough of the hours so that the result will produce a reasonable fee.

tiff's own nominal damages or by the societal interest she purported to represent.

Plaintiff had her bags searched while she was leaving the Los Angeles Airport. This is not a setting in which travelers have the right to the maximum expectation of privacy.[6] The search complained of, although found to be unlawful by the jury, was not intrusive—plaintiff's over-the-shoulder and carry-on bags were searched on the floor of the airport. While plaintiff testified that she was embarrassed and humiliated by having her bag searched in public view, the jury seems to have viewed her much the same as the Court did, as having been annoyed at the inconvenience to which she had been subjected and angered by her belief that the officers had lied to her about their justification. Plaintiff did not appear to have suffered any severe emotional distress as a result of the search.[7]

The liability issue at trial turned almost entirely upon the relative credibility of the officers' testimony that plaintiff had expressly consented to the search, and her express denial of any such consent. The case raised no complex questions of law, and its testimonial aspects were remarkably simple. No more than the most cursory pre-trial discovery was called for and no more than that appears to have been done. The case did not require the skills of a highly competent attorney, and even in the hands of a less skilled attorney, it should not have required the expenditure of an inordinate amount of time.

The Court notes the tendency of civil rights lawyers in this district to have specialized practices devoted solely, or almost solely to such cases. Those with broader practices, almost without exception, work exclusively on a contingent fee basis.[8] The Court further notes that, in its experience, even the most skilled and best known civil rights lawyers frequently take cases which do not present novel questions or significant issues of policy, and which do not require the highest and best use of their professional competence.

Under these circumstances, it is patently unsound to conclude that the skill and experience of a lawyer are reflected in his or her "customary" billing rate, and that multiplying the hours reasonably charged by a lawyer at that rate will produce a reasonable fee.

In *Gomez* this Court agreed with counsel that, in light of the nature, difficulty and complexity of the issues involved in that case, a commercial client would have been well-advised to engage him and to pay his proposed rate. Presuming, as the Court must, that the jury verdict in *Gomez* was correct, and that the public interest was thereby served, the Court believes that the taxpayers received full value for counsel's services in that case.

In contrast, the Court believes that no commercial taxpayer would even consider engaging any lawyer, no matter how skilled or experienced, to handle the case to which the present application pertains at the same hourly rate. In this Court's view, there was virtually nothing involved in the facts or law of this case which would allow a lawyer to bring superior skill or experience to bear to justify a higher hourly rate, either through more efficient use of time, or by more sophisticated understanding or development of issues.

---

6. See *Florida v. Rodriquez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984) (finding that articulable suspicion, rather than probable cause, was sufficient for seizure of defendants in a major international airport, and noting that extensive anti-hijacking surveillance and equipment created a lesser reasonable expectation of privacy (citing *Florida v. Royer*, 460 U.S. 491, 515, 103 S.Ct. 1319, 1333, 75 L.Ed.2d 229 (1983) (Blackmun, J., dissenting))); *United States v. Moreno*, 475 F.2d 44, 47–49 (5th Cir.), *cert. denied*, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973) (holding that the threat of air piracy justifies special fourth amendment considerations in airports, akin to those at border crossings, which allow warrantless searches in certain cases).

7. Counsel's suggestion to the jury that it award nominal damages to the plaintiff presumably was made in the hope that the jury would concentrate on the punishment aspect of punitive damages. The jury appears to have done that, but its punitive damage award of $3000 does not suggest that the jury considered the officers' conduct to be grossly egregious.

8. The Court is aware of only one attorney who has come before it on a civil rights matter who has had a sufficient commercial practice utilizing hourly billing to have had a credible "billing rate".

Nevertheless, this Court considers itself bound by *Dague* to attempt some sort of lodestar calculation for the purpose of determining the fee in this case. To do so, and to reach a result which the Court would consider to be within the bounds of reason, however, requires the Court to reject some of the premises upon which it understands the holding in *Dague* to have been based.

Specifically, the Court rejects the premise, if indeed it is one, that lawyers trying civil rights cases should be paid at hourly rates which are based on their levels of skill and experience, and which are the same without reference either to the difficulty or complexity of the particular case or to the way in which the hours are expended. The Court also rejects the premise that it is possible to determine whether or not specific time charges are reasonable, without detailed analysis of precisely how the time was spent and the degree to which the experience and expertise of the billing attorney added to or detracted from the efficiency with which the work was done.[9] Finally, the Court rejects as inherently dangerous, and inappropriate in this case, any attempt to arrive at a reasonable number of hours by applying a blanket discount to the number of hours actually shown by the records of time actually spent.[10]

■ In its lodestar calculation, the Court starts from the premise that in determining a reasonable hourly rate the proper focus is not upon what an appropriate or customary hourly rate should be for the particular lawyer who has done the work, but rather upon the nature of the services rendered, and what a reasonable commercial client would pay by the hour for those services if the client were free to choose its own counsel.

The Court takes guidance in this case from the information provided to it in *Gomez* concerning the hourly rates customarily paid by the City to outside counsel who defend civil rights cases. The City usually pays $125 to $135 for attorneys of partner status and experience and $90 to $125 for those of associate status and experience. In no event does the City pay more than $175 per hour to outside civil rights counsel.

In light of the relative simplicity of the issues in this case, the Court believes that it would not be reasonable for a commercial client to engage a lawyer of maximum skill and experience to handle this matter. On the contrary, the Court concludes that it would be reasonable to hire a lawyer whose skill and experience were substantially above the minimum partner level only if associate level attorneys were assigned to handle a substantial amount of the work which did not involve witness depositions or appearances in Court. Because counsel in this case did not employ associates, the Court concludes that a reasonable average rate for the services rendered in this case is $125 per hour.[11]

---

**9.** The fee application in this case reflects eleven hours spent on March 14 and 15, 1993, reviewing defense jury instructions and the cases cited, as well as shepardization and independent research on issues raised. In light of the mundaneness of the legal issues raised in this case, it is difficult to imagine how a sophisticated and experienced lawyer could spend so much time in this manner. How this Court might determine some different number of hours which might "reasonably" have been spent on these matters is equally difficult to imagine, however, as is how the product of any such effort would produce a more "reasonable" fee than would be produced through the exercise of experienced judgment.

**10.** Although the Supreme Court has not expressly authorized the practice, it appears from this Court's review of fee cases that a blanket discount applied to the total number of hours is very commonly used by judges to reduce the amount of fees below the amount sought by lawyers in fee applications. The Court is aware of no case in which this practice has been questioned or expressly approved or disapproved. Because the practice seems to be well-known, however, the almost inevitable tendency among prevailing plaintiff's attorneys to "soften" the hours included in the bills (*i.e.*, to construe the term "billable hour" so as to increase the number of such hours expended) seems to have followed. The Court views the hourly charges in this case as being extremely soft, but the phenomenon is by no means limited to this counsel or this case. Indeed, there appears to be an inherent tendency toward softness in time charges which are incurred on a contingent basis, and which will not be paid for by the client or come out of its recovery.

**11.** The Court acknowledges that it did not undertake a similar analysis in *Gomez* yet maintains that the rates applied and the conclusions reached in that case were reasonable and valid.

Although, for the reasons given, the Court does not consider it possible to undertake a meaningful analysis of the quality or integrity of the hourly charges reflected by the fee application, it sees no alternative but to undertake some such analysis. In doing so the Court will consider whether the hours charged relate to the plaintiff's claims against the City and others, upon which she did not prevail, or whether they relate to claims against the officers individually, upon which she did prevail.

■ The fee application is not as clear as it might be in this regard, but based upon what is before it, the Court concludes that 70.0 hours should be deducted from the total time charged, because the work appears to have been directed to the cases against defendants as to whom the plaintiff did not prevail.[12] This deduction leaves a total of 132.5 as the reasonable number of hours to be used in the lodestar calculation. Multiplying this number times a fee rate of $125 produces a fee of $16,562.50.

There remains the question posed by *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). This Supreme Court decision, which was published after both the Supreme Court's opinion in *Dague* and this Court's opinion in *Gomez,* established that counsel's entitlement to fees under § 1988 does not necessarily follow from the fact that plaintiff prevailed as to some part of its claims. *Farrar,* —— U.S. at ——, 113 S.Ct. at 574–75 (holding that status as a prevailing party does not by itself entitle a plaintiff to attorney's fees; rather, "[t]he most critical factor in determining a fee award's reasonableness is the *degree* of success obtained...." (emphasis added)).

In this Court's experience, cases brought to redress constitutional violations usually have three purposes: (1) to vindicate a constitutional right through the award of at least nominal damages; (2) to compensate the plaintiff for any actual damages incurred; and (3) to deter future violations by "sending a message" to the wrongdoers. In this case, as to the officers involved in the search, plaintiff accomplished two of the three purposes. She vindicated her constitutional right and "sent a message." Although the message was not overly strong, as the Court has calculated the lodestar, the price for sending it does not seem unreasonable.

The Court has carefully considered the question whether to apply some offset to the fee by reason of the fact that plaintiff unsuccessfully sued twenty eight defendants on the theory that the search in question resulted from the deliberate indifference by these people to the problem of unlawful searches of citizens.

■ Nevertheless, the Court concludes that plaintiff's failure on the claims against other defendants does not warrant a reduction of the fee in this case. Even though the claims on which plaintiff did not prevail derive from the same occurrence, they depend on facts other than those on which the liability of the searching officers is based. Therefore, plaintiff's failure may be attributed as much to the jury's refusal to find the facts necessary for recovery, as to the failure of plaintiff's counsel to identify and apply the law.

As the Court understands the current law, the fee payable to plaintiffs' counsel may be reduced only if the claims as to which plaintiff has prevailed were joined with frivolous claims. In such a case the Court may award the prevailing defendant its attorneys' fees expended in defending against the frivolous claim, in effect offsetting or completely eliminating the plaintiff's fee award for the claim upon which the plaintiff prevailed.[13]

The Court has considered but rejected this approach in the present case. Although the Court considers it wasteful for plaintiff's

---

**12.** The conclusion includes 50.0 hours which the time charges seem clearly to indicate were charged to issues on which plaintiff did not prevail, and an additional 20 out of the remaining hours which the charges do not attribute to specific issues in the case. The Court regards this conclusion as conservative and in counsel's favor.

**13.** *See Elks National Foundation v. Weber,* 942 F.2d 1480 (9th Cir.1991); *Evers v. County of Custer,* 745 F.2d 1196 (9th Cir.1983); *Ellis v. Cassidy,* 625 F.2d 227 (9th Cir.1980).

counsel to have named twenty-six of the twenty-eight individual defendants in this case without preparing a more vigorous prosecution of the case against them, the Court is not convinced that the claims should be regarded as having been frivolous for the purpose of awarding the prevailing defendant its fee under § 1988. In light of the relatively modest fee to be awarded in any event, the Court considers it inappropriate to reduce that sum further.

For the foregoing reasons, IT IS HEREBY ORDERED that the motion of plaintiff Barbara Gillen for attorney's fee be GRANTED and plaintiff's counsel be awarded a fee of $16,562.50.

IT IS SO ORDERED.