**Julia GOMEZ, et al., Plaintiffs,**

**v.**

**Daryl GATES, et al., Defendants.**

**No. CV 90–0856 JSL (Sx).**

United States District Court,
C.D. California.

July 31, 1992.

---

4. Although defendants do not refer to it, *Bacon v. City of Los Angeles*, 843 F.2d 372 (9th Cir. 1988) reaches the same conclusion.

Stephen Yagman, Yagman & Yagman, Venice, Cal., for plaintiffs.

Don Vincent, Asst. City Atty., Los Angeles, Cal., for defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR ATTORNEY'S FEES

LETTS, District Judge.

The Motion of plaintiffs JULIA GOMEZ, *et al.* for attorney's fees pursuant to 42 U.S.C. § 1988 came on for hearing regularly on May 11, 1992.

Having reviewed the papers filed in connection with this matter and being fully apprised of the relevant facts and law, the court finds as follows.

### I. Facts

This case arose from a shooting by police officers during a robbery of a McDonald's restaurant in Sunland, California on February 12, 1990. The case was tried to a jury beginning on January 7, 1992, and the jury rendered special verdicts in favor of the plaintiffs against all defendants remaining at the time of trial,[1] except the City of Los Angeles, on March 30, 1992. Because the court's analysis depends in part on the peculiar characteristics of the case, a brief discussion of the evidence follows.

The officers involved in the shooting were members of the Los Angeles Police Department's ("LAPD") Special Investigation Section ("SIS"). They had the robbers under surveillance as suspects in prior McDonald's armed robberies for several weeks. The evidence strongly suggested that several of these robbers had in fact taken part in the earlier robberies.

There was evidence from which the jury could have concluded that the officers deliberately allowed the Sunland McDonald's robbery to occur before attempting to arrest the robbers. There was also evidence that this sequence was consistent with the

---

1. The court granted directed verdicts in favor of certain other defendants before trial.

general practice of the SIS. It was undisputed that the SIS officers notified the police dispatcher not to send further officers in response to the store manager's 911 call, because the SIS unit was already on the scene.

The plaintiffs' theory of the case was that the SIS officers had deliberately created a situation in which deadly force would be necessary, but apparently justifiable as self-defense. The evidence indicated that in fact the robbers were "armed" with inoperable pellet guns believed by the officers to be real guns. The evidence further showed that after first "jamming"[2] the vehicle in which the robbers were attempting their getaway, the officers fired into the car approximately twenty shotgun rounds, of which a large number struck the robbers. The evidence also showed that after this initial barrage, one of the robbers, Burgos, was shot and killed while fleeing the scene. The officers' testimony, which the jury apparently did not believe, was that Burgos, after being shot once and while falling to the ground, leveled his pellet gun at them as if preparing to shoot. Another officer shot a second robber, who was already fatally or near-fatally wounded, through the top of the head from a distance of two feet. The same officer then shot plaintiff Olivas, the only robber to survive, in the stomach from a distance of about a foot and a half. Another officer who had approached the car then shot the fourth robber, who also was already fatally or near fatally wounded, from approximately the same distance.

Based upon this and other evidence, the jury held liable all of the officers who fired shots and former Police Chief Daryl Gates.[3] The jury awarded no compensatory damages. It did, nonetheless, award a total of $44,000 in punitive damages to Olivas and the survivors of the three dead men.

The trial of this case spanned thirteen weeks. It presented numerous complex questions of fact and law, including whether and how the Report of the Independent Commission on the Los Angeles Police Department (the "Christopher Commission Report") could be used as evidence, a matter of first impression; whether the chairman of the Commission could be called as a witness; and whether an FBI agent could be called to testify as to matters learned during a criminal investigation of the incident. The subpoena of the FBI agent caused an interlocutory appeal which interrupted the trial for four weeks.

After the jury verdict was entered, plaintiffs' counsel filed the fee motion at issue. Between the hearing on this motion and the court's disposition of it, the Supreme Court announced its decision in *City of Burlington v. Dague*, — U.S. —, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Having reviewed the prior law, and formulated a tentative decision in light of that law, this court is now required to determine the extent, if any, to which *Dague* requires a different analysis and decision.

## II. The Law Before *Dague*

In *Dague*, the Supreme Court addressed many of the apparent anomalies in earlier decisions regarding fee awards under Section 1988 and other fee-shifting statutes.[4] In doing so, however, it was not required to answer a number of questions which must be addressed here.

Before *Dague*, the principal Supreme Court decisions which required consider-

---

**2.** "Jamming" means boxing in a suspect's car with police cars.

**3.** Gates was called as a witness and testified extensively about his knowledge of SIS practices, and about his policies regarding excessive force.

**4.** *Dague* involved an award of attorneys' fees under § 7002(e) of the Solid Waste Disposal Act, 90 Stat. 2795, 2826, as amended, 42 U.S.C. § 6972(e), and § 505(d) of the Federal Water Pollution Control Act (Clean Water Act), 86 Stat.

816, 889, as amended, 33 U.S.C. § 1365(d). The Court stated that its decision was not limited to these particular fee-shifting statutes, however. Quoting from one of the statutes, the Court said:

This language is similar to that of many other federal fee-shifting statutes, see *e.g.*, 42 U.S.C. §§ 1988, 2000(e)–5(k), 7604(d); our case law construing what is a "reasonable" fee applies uniformly to all of them. *Flight Attendants v. Zipes*, 491 U.S. 754, 758 n. 2, 109 S.Ct. 2732, 2735 n. 2, 105 L.Ed.2d 639 (1989).

— U.S. at —, 112 S.Ct. at 2641.

ation were *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), *City of Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986), and *Pennsylvania, et al. v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley II"),* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). The principal Ninth Circuit cases which required consideration in light of the Supreme Court decisions were *Fadhl v. City and County of San Francisco,* 859 F.2d 649 (9th Cir.1988), *Cabrales v. County of Los Angeles,* 864 F.2d 1454 (9th Cir. 1988), *D'Emanuele v. Montgomery Ward & Co., Inc.,* 904 F.2d 1379 (9th Cir.1990)[5], *Corder v. Gates,* 947 F.2d 374 (9th Cir. 1991), and *Bernardi v. Yeutter,* 951 F.2d 971 (9th Cir.1991).[6]

The thrust of these pre-*Dague* cases was as follows. Before *Hensley,* the cases suggested that a "reasonable" attorney's fee award was to be determined by reference to the so-called *"Johnson* factors," from *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). These factors were referred to in the Senate Report on the Civil Rights Attorney's Fees Awards Act of 1976 (the statute enacting Section 1988), S.Rep. No. 94–1011 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, and the Ninth Circuit adopted them in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). The *Johnson* factors are:

> (1) The time and labor required ... (2) The novelty and difficulty of the questions ... (3) The skill requisite to perform the legal service properly ... (4) The preclusion of other employment by the attorney due to acceptance of the case ... (5) The customary fee ... (6) Whether the fee is fixed or contingent ... (7) Time limitation imposed by the client or the circumstances ... (8) The amount involved and the results obtained ... (9) The experience, reputation, and ability of the attorneys ... (10) The "undesirability" of the case ... (11) The nature and length of the professional relationship with the client ... (12) Awards in similar cases.

*Johnson,* 488 F.2d at 717–19.

At the time Section 1988 was adopted, however, another method of calculating "reasonable fees" coexisted with the *Johnson* factors analysis. That other method was simply multiplying the number of hours reasonably expended on the matter by a reasonable hourly rate. The product of that multiplication has come to be known as the "lodestar."

In *Hensley v. Eckerhart,* the Supreme Court attempted to reconcile the two strands of analysis, holding that the lodestar is "[t]he most useful starting point for determining the amount of a reasonable fee." *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. *Hensley* noted, however, that "[t]he district court also may consider other factors identified in *Johnson* [citation omitted], though it should note that *many* of these factors *usually* are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." 461 U.S. at 434, n. 9, 103 S.Ct. at 1940 (emphasis added).

In *Blum v. Stenson,* the Supreme Court went a step further, and said that "the 'product of reasonable hours times a reasonable rate' normally provides a 'reasonable' attorney's fee within the meaning of the statute." *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548 (citing *Hensley*). The *Blum* Court then identified some of the specific *Johnson* factors which it deemed necessarily subsumed within the lodestar, and others which are normally, but not necessarily, subsumed.[7] The Court expressly chose not

---

**5.** *D'Emanuele* involved an award of attorneys' fees in an action under ERISA, not a civil rights statute. Nevertheless, the Ninth Circuit stated, "[W]e expressly hold that the lodestar/multiplier factors [approved by the Supreme Court in *Hensley,* a Section 1988 case] should be considered in determining the amount to be awarded in an ERISA case." 904 F.2d at 1383.

**6.** The court also considered *Chalmers v. City of Los Angeles,* 676 F.Supp. 1515 (C.D.Cal.1987).

**7.** The "novelty and complexity of the issues" was of the former type; the "quality of representation" and "results obtained" were in the latter category.

to address whether the "risk of not being the prevailing party"—*i.e.*, the contingent nature of the attorneys' fees—was subsumed. 465 U.S. at 901 n. 17, 104 S.Ct. at 1550 n. 17.

After *Blum*, the relevant cases have focused upon when, if ever, a "multiplier"—a number by which the lodestar would be multiplied to determine the final fee—would be justified to compensate the prevailing attorney for taking the case on a contingent basis.

The decision of the multiplier issue required the Court to resolve the tensions among three basic themes which had run consistently through its decisions on statutory attorney's fees. The first theme was that " 'a plaintiff who obtains relief in a civil rights lawsuit "does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance." ' " *City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986) (quoting H.R.Rep. No. 94–1558, p. 2 (1976) (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968))). The second such theme was that counsel are to be compensated only for claims successfully prosecuted. *Hensley*, 461 U.S. at 424, 103 S.Ct. at 1933. The third consistent theme was that both elements of the lodestar—reasonable hours and reasonable rate—were to be determined by reference to what is reasonable in the commercial market.

The conventional wisdom is that plaintiffs' lawyers who work on the basis of contingency must earn an hourly rate equal to some multiple of that charged by civil rights defense lawyers, because the defense lawyers are paid in all cases, while the plaintiffs' lawyers are paid only in the cases they win. Although this analysis is

conventional, it is by no means free from doubt. See *infra*.

Following the conventional wisdom, however, courts have reasoned that prevailing plaintiffs' counsel in fee shifting cases must be paid a multiplier in order to attract competent lawyers to prosecute civil rights claims against defense lawyers who are paid by the hour. This analysis was rejected in the principal opinion in *Delaware Valley II*. Justice White, joined by Justices Rehnquist, Powell and Scalia, stated that "multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is [sic] impermissible under the usual fee-shifting statutes." 483 U.S. at 727, 107 S.Ct. at 3088. Justice O'Connor, agreeing with these four that a multiplier should not be awarded in the case at bar, nevertheless opined that a multiplier might be appropriate in another case if it were based on the market treatment of contingent fee cases as a class, and if the fee applicant could establish that without a multiplier, the prevailing party would have faced substantial difficulty in finding counsel in the relevant market. 483 U.S. at 731–34, 107 S.Ct. at 3090–91. The Ninth Circuit concluded that Justice O'Connor's opinion became the law, but the Second Circuit disagreed. *Compare Fadhl v. City and County of San Francisco*, 859 F.2d 649, 650 n. 1 (9th Cir.1988), with *Dague v. City of Burlington*, 935 F.2d 1343, 1360 (2d Cir.1991), *rev'd*, *City of Burlington v. Dague*, —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (citations omitted).[8]

Justice White's opinion in *Delaware Valley II* did not clearly address the prevailing wisdom—that without multipliers it would be impossible to attract competent lawyers to take civil rights cases. The issue remained open, therefore, whether a multiplier would be justified if the evidence

**8.** In *Fadhl* the Ninth Circuit stated: "Justice O'Connor's concurring opinion constitutes the Court's holding in the case. *Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 53 n. 6 (D.C.Cir.1987); *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 379 & n. 11 (3rd Cir.1987); *Spell v. McDaniel*, 824 F.2d 1380, 1404 & n. 23 (4th Cir.1987); *Crumbaker v. Merit Systems Protection Board*, 827 F.2d 761, 761 (Fed.Cir.1987)."

In contrast, the Second Circuit stated in *Dague*: "Given the outcome in *Delaware Valley II*, we do not view any one of the three separate opinions dispositive on the issue before us today. While some courts view Justice O'Connor's concurring opinion as being the controlling law ... we disagree."

showed that in the particular market, a multiplier was necessary to attract lawyers to that *class* of cases. The Ninth Circuit decided that issue in the affirmative in *Fadhl;* the Second Circuit decided it in the negative in *Dague.*

### III. *Dague:* Questions Answered and Left Unanswered

#### A. An Analysis of *Dague*

In its *Dague* opinion, the Supreme Court definitively foreclosed district court consideration of whether the fee .was contingent or fixed as a factor in setting attorney's fees under fee-shifting statutes. The Court began its analysis by pointing out that the risk of loss in a particular case "is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." —— U.S. at ——, 112 S.Ct. at 2641. The Court skipped lightly over the second factor, saying only that it is "ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so." *Id.*

The Court then observed, "The first factor (relative merits of the claim) is not reflected in the lodestar, but there are good reasons why it should play no part in the calculation of the award." *Id.* To do so, the Court reasoned, "would encourage meritorious claims to be brought, but only at the social cost of indiscriminately encouraging nonmeritorious claims to be brought as well." *Id.* The Court then revisited the rationale advanced by Justice O'Connor in *Delaware Valley II,* allowing a multiplier if the party seeking enhancement could "establish that without an adjustment for risk, the plaintiff would have faced substantial difficulties finding counsel in the local or other relevant market." *Id.* —— U.S. at ——, 112 S.Ct. at 2641 (quoting *Delaware Valley II*). The Court rejected this rationale, finding the most likely reason a plaintiff would have difficulty finding counsel to be the riskiness of the *particular* case, a factor Justice O'Connor and the four justices with whom she concurred had rejected

as a basis for enhancement. *Id.* —— U.S. at ——, 112 S.Ct. at 2641.

The Court further found unpersuasive Justice O'Connor's theory that the market treats contingent fee cases differently "as a class," because "for a very large proportion of contingency-fee cases—those seeking not monetary damages but injunctive or other equitable relief—there is no 'market treatment.'" *Id.* The Court also noted:

> Contingency enhancement calculated on *any* class-wide basis ... guarantees *at best* ... that those cases within the class that have the class-average chance of success will be compensated according to what the 'market' requires to produce the services, and that *all cases* having above-class average chance of success will be overcompensated.

*Id.* (emphases in original).

The Court concluded its analysis by pointing out that the trend in its decisions had been " 'away from the contingent-fee model,' " *id.* (quoting *Venegas v. Mitchell,* 495 U.S. 82, 87, 110 S.Ct. 1679, 1682, 109 L.Ed.2d 74 (1990)), and by invoking its oft-repeated objective that the determination of legal fees " 'should not result in a second major litigation.' " *Id.* (quoting *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941).

*Dague* appears to be entirely consistent with the prior case law, and it comports entirely with common experience. This court has *no* experience consistent with the prevailing wisdom that lawyers who regularly accept engagement on a contingency basis do so in the expectation that they will have to earn some multiple of the prevailing hourly rate in the cases they win, in order to be compensated for the cases they lose. On the contrary, it seems clear that successful contingent fee lawyers assess most cases with the knowledge that they will almost surely settle. Such lawyers expect that the settlement will be high enough for the contingent fee earned to yield a reasonable hourly rate for the time expended. There is every reason to believe, in fact, that most successful contingent fee lawyers could and would remain in the market simply to earn the income they

receive from *settled* cases, even if on average they were grossly undercompensated for the cases which went to trial. For this reason, in addition to those stated in *Dague*, it seems appropriate to conclude that the lodestar need not be enhanced by a multiplier to attract lawyers to meritorious cases simply because they were taken on an contingent fee basis.

The question remains, however, whether there remains any class of cases in which enhancement of the lodestar might still be appropriate. *Dague* did not actually hold that the lodestar is always the beginning and end of the calculation of "reasonable" fees. Nor did the Court expressly reject the *Johnson* factors, as such; it merely added contingency of fee as another *Johnson* factor which is necessarily subsumed in the lodestar. This court must now consider whether *Dague* precluded consideration of another *Johnson* factor which it did not mention, and thus did not similarly declare to be subsumed in the lodestar.

### B. "Undesirable Cases": An Exception to *Dague*

Specifically, *Dague* did not address whether the "undesirability of the case," a *Johnson* factor, may be a basis for enhancing a fee otherwise determined by a simple lodestar calculation. Of course, the factor most likely to make a case "undesirable" is a low likelihood of prevailing at trial. It might seem, therefore, that *Dague* would lead inevitably to the conclusion that the undesirability of the case is not to be considered apart from the lodestar. Nevertheless, in this court's view, *Dague* left room to consider enhancement of the lodestar to reflect the undesirability of particular cases. "Undesirable cases" for this purpose are those in which the plaintiff is unlikely to prevail for reasons having nothing to do with the merits of the claim or the quality of the attorney's performance.

There can be no argument with the Supreme Court's general statement in *Dague* that "the difficulty of establishing [the] merits ... is ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so." *Id.* — U.S. at —, 112 S.Ct. at 2641. In most cases, the difficulty of establishing the merits of a claim turns upon the relative complexity of the issues. In turn, the effectiveness of an attorney in dealing with complex issues depends upon the attorney's skill, and the amount of time spent on the matter.

This analysis applies to most civil rights cases, because they are not qualitatively different from other lawsuits. Most civil rights cases involve legitimate disputes between parties who, in good faith, see the same events differently. The likelihood of success on the merits is determined by the same factors as in all other cases; the only difference is that in assessing the likely damages, the defendant must include exposure to attorneys' fees. Like other kinds of cases, most civil rights cases settle before trial. The settlements are based upon the lawyers' common assessments of the likelihood of success on the merits, and plaintiffs' counsel receive their fees without actually incurring the risk of loss at trial.

In some civil rights cases, primarily those involving use of allegedly excessive force by police against unattractive plaintiffs, however, it is extremely difficult for the plaintiff to prevail, and virtually impossible to obtain a recovery large enough to support a reasonable fee. This is so regardless of the merits of the claim, or the skill, experience or diligence of counsel. Many excessive force cases, such as the case at bar, pit admitted criminals against law enforcement officers. Jurors have no desire to believe criminals, or to reward them even if the jurors chance to believe their stories. On the other hand, jurors want to believe law enforcement officers, and hesitate to punish them for things done, even to excess, while acting in an "on-duty" capacity. Often such cases present a swearing match between police officers and an alleged excessive force victim as the only issue to be decided by the jury. Often there is virtually nothing a lawyer can do through the application of skill, ex-

perience or time to change the jurors' preconceptions of relative credibility.

The more unattractive the plaintiff, the harder it is for him to prevail, and the more certain it is that even if he does prevail the damages will be nominal. Not surprisingly, counsel for law enforcement are loath to pay out money voluntarily to "common criminals," their relatives, or the lawyers who represent them. The more usual reaction is that the plaintiff deserved whatever he got, and the lawyer deserves nothing. Thus, the chances of settlement are not high, even if the plaintiff is willing to accept a settlement which reflects not only the risk of loss inherent in the dispute on the merits, but also his peculiar unattractiveness as a claimant. Lawyers who take on cases to vindicate the rights of unattractive plaintiffs can almost count on being put to trial. The time must be invested, and the risk of loss actually taken, before the lawyer has a chance of any fee at all.

The difficulties that excessive force plaintiffs face do not indicate that too many such cases are being filed. The value of having such cases filed is not fairly reflected by their probability of success on the merits. The stories told by the plaintiffs and the officers in excessive force cases usually differ dramatically. Even where the officers' version is fairly believed, and the jury concludes that the force used was objectively "reasonable," the plaintiff's subjective belief that the force used was unreasonable invariably seems firm. Regardless of their outcomes, this court has yet to hold a trial on an excessive force case which did not deserve its day in court. The protection of Constitutional rights does not depend on the social acceptability of the person whose rights are abused.

### C. Compensating for Undesirability: Adjusting the Lodestar

Because it is difficult for unattractive plaintiffs to prevail in undesirable cases for reasons unrelated to the relative merits of the claim or to the difficulties in establishing those merits which are "ordinarily reflected in the lodestar," a fee computation which considers only those two factors is not "reasonable," and will not attract enough lawyers to take those cases.

The alternative to awarding a multiplier in cases which fit the definition of undesirable cases used here is to adjust either factor in the lodestar equation to produce a higher fee. The number of hours expended by the attorney, however, is a constant. It can be adjusted downward to reflect waste, but presumably not upward to reflect efficiency. In any event, the difficulty of establishing the merits of an undesirable case is generally not related to the amount of time expended. Simply billing more hours, no matter how they are spent, is not likely to have much effect on jurors' preconceptions about the relative credibility or entitlement to judgment of criminals and police officers.

The hourly rate charged by the attorney, on the other hand, might be adjusted to reflect the difficulty of prevailing in an undesirable case. Such an approach presents considerable difficulties, however. The Supreme Court has not explained how to determine a reasonable hourly rate. The Court seems to assume that lawyers who charge by the hour have established set rates for substantially all matters they undertake. The Court also seems to assume that the hourly rates established by lawyers vary primarily by reference to relative differences in skill and experience. The former assumption is no doubt accurate, but the latter is more doubtful.

As this court understands the market for legal services, the legal specialty, the character of the law firm, and the type of clients it serves are the primary determinants of the hourly rates lawyers charge in competitive markets. For a given type of work, lawyers in large firms charge institutional clients far more per hour than is charged by lawyers of the same skill and experience in small firms to individual clients. Similarly, business trial lawyers charge their clients far more per hour in patent, antitrust or securities cases than lawyers of equal skill and experience charge their clients in insurance and other such cases, including excessive force cases.

In Los Angeles, and presumably in similar urban markets, excessive force cases constitute a distinct legal market. The determination of a "reasonable hourly rate" presents precisely the difficulty to which the *Dague* Court pointed in its discussion of contingent fees. There is no market comprised of hourly rate lawyers who take cases in which fees are awarded only to prevailing parties. Individual lawyers who represent plaintiffs on a contingent fee basis normally do not have a credible history of arm's length hourly billing.

There is, therefore, no basis for determining what a reasonable hourly rate should be in excessive force cases other than the artificial market established by the judiciary using the lodestar approach to fee-shifting cases. "Reasonable" hourly rates are no more than what lawyers have told judges, and judges have repeated to them. Such rates have never been tested in a competitive marketplace; it is an open question whether any client would pay them voluntarily. In addition, adversaries in these cases lack the mutual trust and respect that private clients presumably share with their counsel, and thus plaintiffs' lawyers lack the usual incentives to keep their rates and hours reasonable. *See Hensley*, 461 U.S. at 441, 103 S.Ct. at 1943 (Burger, C.J., concurring).

The parties in this case have suggested two ways to determine the hourly rate for purposes of calculating the lodestar, neither of which seems appropriate to the circumstances. Plaintiffs' lead counsel asserts that his hourly rate should be equated to that charged by partners of comparable experience at a large international law firm. Counsel urges that such a rate has been accepted by other district courts, and on appeal, and therefore should be accepted by this court. No doubt the large firm rate, if uniformly granted, would easily attract competent counsel to even the most undesirable excessive force cases. Perhaps this is what the Supreme Court intends.

Defendants ask, however, why a reasonable hourly rate for plaintiffs' counsel in excessive force cases should be higher than that charged competitively by the lawyers who regularly *defend* such cases. Defendants suggest a rate equivalent to the rate charged by lawyers of comparable skill and experience in premier excessive force defense firms.

The defendant has the better of this argument as to most excessive force cases. There is nothing inherently undesirable about excessive force cases. The common denominator of most of them is that the force allegedly used upon the plaintiff was disproportionate to the seriousness of the crime he was suspected of committing.

A plaintiff who was a "suspect" at the time the allegedly excessive force was used against him, but in fact had committed no crime, is not always at a disadvantage when pitted against police officers who injured him seriously. The case brought on behalf of such a plaintiff, therefore, may not be an "undesirable" case as that term is used here, and there may be no need to enhance the fee determined by the lodestar calculation.

As to all fee-shifting cases, including excessive force cases, this court believes that a reasonable hourly rate should be determined by looking to the rate normally charged by lawyers of comparable skill and experience who routinely defend similar cases. To award hourly rates commensurate with those routinely charged by trial lawyers involved in other legal specialties would overcompensate the civil rights plaintiff's lawyer, unduly penalize the defendant, and subsidize the lawyer for taking a nonmeritorious claim. These results contravene *Dague* and the fee-shifting statutes themselves.

On the other hand, foreclosing enhancement altogether would only exacerbate the difficulty that would-be plaintiffs already have in finding counsel to prosecute meritorious claims.[9]

---

**9.** This case does not require the court to give careful consideration to undesirable cases outside the area of excessive force. It seems likely, however, that the analysis here would apply equally to all cases involving a meritorious claim that would produce a higher economic

## IV. Applying the Undesirable Case Analysis to this Case

 The court doubts that any lawyer in the greater Los Angeles area, other than plaintiffs' lead counsel, would or could have represented them in this case, and devoted the time, effort and skill which it took to produce the verdict. If counsel were to be compensated only for the number of hours expended at the same rate charged by defense counsel in this case, he would be seriously undercompensated for the service performed, and the court is fully satisfied that the fee award would be insufficient to attract comparable counsel to similar cases in the future.

In this case, the role of the plaintiffs' attorney as a private attorney general was maximized. Although only collaterally, the case exposed to public view the LAPD's questionable alleged practice of surveilling persons suspected of violent crimes and then watching, without intervening, the suspects commit another crime before arresting them. The trial came soon after the publication of the Christopher Commission Report and shortly before the verdict in the Rodney King case, at a time when the controversy over the LAPD's use of force was at its height. The case may also be thought by some to have provided an illustration of the "code of silence" referred to in the Christopher Commission Report, since the testimony of all twenty-one officers who participated in the McDonald's surveillance on February 12, 1990 did not conflict on any material issue. The case also showed, in spite of the convincing nature of the evidence summarized above, how difficult it is for plaintiffs who are undeniably serious wrongdoers to get a jury verdict in their favor, and how nearly impossible it is for them to obtain a significant economic recovery.

Plaintiffs' lead counsel has suggested an hourly fee of $350 per hour for himself and his partner Marion Yagman, and of $235 per hour for Edward Figaredo, with whom he was associated in the case. The court finds these rates to be reasonable in light of the peculiarly undesirable aspects of this case. Plaintiffs' counsel submitted time sheets detailing a total of 850.75 hours spent on the case itself and on the motion for attorney's fees. Marion Yagman's time sheets show 505.5 total hours, and Edward Figaredo's time sheets show 137 total hours. The court finds, however, that plaintiffs' counsel kept their time records with significantly less care and detail than is usually required of attorneys who bill by the hour. Thus, the court has been unable to verify the reasonableness of the number of hours expended and has concluded that the total should be reduced by 15% for each of plaintiffs' attorneys. The adjusted hours, then, are 723, 429 and 116, respectively. Multiplying the adjusted figures for hours spent by plaintiffs' counsel's requested rates yields fees of $253,050, $150,150 and $27,260, respectively, for a total fee award of $430,460.

Defendants objected that plaintiffs' counsel's proposed rates are too high. Defendants did not propose specific alternative rates, but to guide the court's exercise of discretion, they presented the hourly rates they pay to private counsel with whom they contract to defend civil rights cases. Those rates are as follows: $175 per hour maximum; $125 to $135 per hour for attorneys of partner status and experience; and $90 to $125 per hour for associates. In this rate schedule, both Stephen and Marion Yagman deserve the maximum rate of $175 per hour, and Figaredo deserves $125 per hour, the top rate for associates. Multiplying these rates by the adjusted hours yields fees of $126,525, $75,075 and $14,500, re-

---

recovery if not for the unattractiveness of the plaintiff. *The lodestar figure will be too low to attract attorneys.* Failing to enhance the fee by either a multiplier or a higher hourly rate would thus violate the statutory preference that meritorious lawsuits be brought.

The court wonders whether further analysis might cause it to distinguish between two classes of fee-shifting statutes. In one class, the economic recovery would be high enough that the case would be brought even without a fee-shifting statute, but the Congressional intent was that the recovery be net of fees. In the other class, such as Section 1988, the Congressional intent was that meritorious cases would be brought in the first place.

spectively, for a total fee award of $216,-100.

The court finds the rates suggested by defendants to be appropriate for ordinary excessive force cases handled on a contingency fee basis. In this case, however, the court believes that a multiplier of 1.75 would have to be added to reflect the peculiarly undesirable nature of this case from the standpoint of a lawyer who regularly accepts employment on a contingent fee basis. Enhancing the lower lodestar fee by a multiplier of 1.75 yields a total fee of $373,175.

For the reasons stated, namely that the higher hourly rate is not actually being paid to plaintiffs' lawyers in this market, and that the need for enhancement inheres in factors peculiar to the undesirable excessive force case, the court chooses the lower lodestar plus multiplier and awards a fee of $378,175.

IT IS SO ORDERED.