**Lohren PRICE, et al., Plaintiffs,**

v.

**A. KRAMER, et al., Defendants.**

**No. CV 94–6506 JSL.**

United States District Court,
C.D. California.

Dec. 19, 1997.

Lohren Price, Michael L. Adelson, Epstein, Adelson & Rubin, Los Angeles, CA, Nicholas Cramer and Daniel Mason, Howard R. Price, Brodey & Price, Beverly Hills, CA, for Plaintiffs.

John L. Fellows III, City Attorney, Robert Acciani, Senior Deputy City Attorney, Torrance, CA, Martha A. Shen, Sharon Coverly Hughes, Hughes & Shen, Los Angeles, CA, for Defendants.

**1296**

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR AWARD OF ATTORNEY'S FEES

LETTS, District Judge.

Before the court is the motion of plaintiffs Lohren Price, et al., for award of attorney's fees pursuant to 42 U.S.C § 1988, which came for hearing regularly on September 15, 1997.

This court has previously detailed the difficulty faced by a trial court judge when applying the law of both the United States Supreme Court and the Ninth Circuit with respect to attorney's fee awards pursuant to the Civil Rights Attorney's Fees Award Act of 1976. *See Trevino v. Gates*, 888 F.Supp. 1509, 1513–16 (C.D.Cal.1995), *aff'd in part, rev'd in part*, 99 F.3d 911 (9th Cir.1996) (*"Trevino I"*); *Gillen v. Gates*, 847 F.Supp. 1475 (C.D.Cal.1994), *aff'd*, 56 F.3d 71 (9th Cir.1995); *Gomez v. Gates*, 804 F.Supp. 69 (C.D.Cal.1992).

■ Pursuant to 42 U.S.C. § 1988, plaintiffs are entitled to a "reasonable" attorney's fee. It is well-settled that the "starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This "lodestar" method serves as the "initial estimate of a reasonable attorney's fee," *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and while its application is strongly presumed to represent a reasonable fee, *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*"Delaware Valley I"*), the inquiry does not end with it. The statutory command is that the fee awarded be "reasonable." The Ninth Circuit has instructed that "[t]he assessment of reasonableness is made by reference to standards established in dealings between paying clients and the private bar." *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1543 (9th Cir.1992).

■ *Davis* is intended to reflect the intent of § 1988 to ensure that private parties are able to obtain the help of an attorney of sufficient competence "in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws." *Delaware Valley I*, 478 U.S. at 565. The statute is not intended to sustain legal careers, *id.*, 478 U.S. at 563, but to create no more than a sufficient incentive such that "private citizens have a meaningful opportunity to vindicate their rights protected by the Civil Rights Acts." *Id.* at 559.[1] In other words, the statute is intended to produce a fee sufficient to ensure that meritorious cases are brought without awarding the prevailing party's attorney more than that attorney would have received from an experienced fee-paying client. *Cf. Gomez v. Gates*, 804 F.Supp. at 77 (C.D.Cal.1992).

After an extensive review of the relevant cases, it appears they a common flaw in that they rest on inaccurate factual premises.

### SUMMARY OF ANALYSIS

Under 42 U.S.C. § 1988, the court must begin its analysis by ascertaining commercially reasonable hourly rate for the services performed. Lawyers seeking and opposing fees submit declarations in order to establish this rate. District courts necessarily rely on the facts alleged in those declarations.

The declarations assume that the relevant factors for comparing and determining the commercial reasonableness of fees are the nature of the litigation and the experience of the lawyer. The court does not doubt that the declarations are consistent with the lawyers' perceptions, but does doubt that those perceptions reflect the realities of commercial legal markets. The court recognizes that its own views come from a perspective limited by the court's experience. This experience, however, includes elements of diversity not widely shared among lawyers.[2] For that

---

**1.** This is not to suggest that the statute is intended to *replicate* the fee that the attorney of a prevailing party would earn with a private fee arrangement with that client. *Cf. Delaware Valley I*, 478 U.S. at 565. The *Davis* inquiry exists as a guideline to reduce the inaccuracy potentially produced by the lodestar method.

**2.** The court has had more than ten years of billing responsibility as a lawyer in four different law firms in two cities. The court has also had more than ten years of payment responsibility as an executive in two corporations, one of which received monthly bills from hundreds of law firms from all over the country and around the world. As a judge, the court has had more than

reason, the court believes that there may be value in advancing its own observations with regard to the realities of commercial legal markets.

Clients select lawyers from among lawyers who regularly represent similarly-situated clients. Lawyers within a particular client-defined market are constrained by competitive forces to charge reasonably comparable fees. Lawyers serving different client-defined markets do not charge comparable fees for what might otherwise be deemed comparable work, both because of differences in client ability to pay for work done, and because of differences in underlying client objectives.

There is no commercial equivalent to a lawyer who does not look to his own client for the payment of fees.[3] District court judges and the lawyers who make fee applications to such judges are the closest equivalent of a commercial client-defined legal market. As a result, starting with a hypothesized commercial equivalent to the lodestar unnecessarily impedes district court judges from using their own expertise in setting reasonable fees.

## AMPLIFICATION OF ANALYSIS

**1. Different legal markets are defined by the clients who engage attorney services, not by the attorneys who provide those services.** Clients engage lawyers; lawyers do not engage clients. Almost all clients select lawyers who regularly represent similarly-situated clients. With few exceptions, large corporations select lawyers in large law firms that represent similar large corporations. Small corporations select smaller firms that represent other small corporations. Insurance companies select law firms that represent other insurers. Cities select law firms that represent other cities. Wealthy individuals select law firms that represent other individuals in their respective businesses, i.e. sports, entertainment, real estate firms, etc. Less-wealthy individuals select contingent fee lawyers except when litigating against each other in small claims courts.

**2. It *is* possible to make meaningful comparisons of legal fees for similar services within client-defined legal markets; it is *not* possible to make meaningful comparisons of legal fees for similar services between different client-defined legal markets.** Because clients select lawyers who represent similarly-situated clients, those lawyers set their rates competitively. Although these rates may change with time, they remain comparable through time within client-defined legal markets. In addition, different kinds of clients approach litigation with very different objectives. Client objectives tend to be similar within client-defined legal markets, but different from the client objectives in different client-defined legal markets.[4] The similarity of client objectives within client-defined legal markets produces competitive hourly rates. These rates are generally comparable within client-defined legal markets, but not comparable with rates charged in other client-defined legal markets.

**3. Clients consider the reasonableness of the fees charged by reference to their knowledge of and experience with the charges of lawyers in that client-defined legal market.** Experienced clients decide whether fee charges are reasonable by reference to fees charged to themselves and, to their knowledge, other similarly-situated clients in matters they deem to be comparable. When dissimilarly-situated clients are involved in litigation, each almost invariably

---

ten years of fee payment responsibility in criminal and commercial cases as described in the text of this opinion, infra. The court has also lectured on this subject at numerous law firms, corporations, and at the UCLA Anderson Graduate School of Management.

**3.** Even contingent fees come out of a recovery which otherwise would belong entirely to the client.

**4.** In practice, the simple objective of obtaining or avoiding a money recovery is not so simple. The pursuit of the money objective differs most clearly because of the nature of the client rather than the nature of the matter. Differences among clients include: (a) risk/benefit analyses. (frequently resulting from whether the defendant is a profit making organization), (b) the ability to withstand the costs and burdens of litigation, (c) whether litigation is a normal part of the client's usual course of business or affairs, (d) the need or lack of need for immediate resolution of the matter, (e) whether the party can withstand a worst-case result of the litigation and (f) whether payment is to be made or received personally or for the benefit of others.

chooses a lawyer from within its own client-defined legal market, and pays fees which are deemed reasonable within that market. The fees may vary widely when compared by reference to the nature of the matter being litigated and the experience of the lawyers involved, but they will not vary widely from fees charged within the client-defined legal market.

4. **Lawyers of comparable training and *length* of experience do not have client-comparable experience, and do not command the same hourly rates.** Lawyers who practice in different client-defined markets do not charge the same hourly rates, even if their training and experience is otherwise comparable.

5. **Among experienced clients and lawyers, the lodestar computation is regarded as a working hypothesis which is accepted if the resulting fee is deemed reasonable, and challenged if the resulting fee is deemed excessive.** Experienced clients do *not* control legal fees by negotiating the lodestar components of an attorney's bill. Clients are almost never in a position to win debates with their attorneys over lodestar computations.[5] From the standpoint of experienced clients, the adjustment of particular bills is rarely even the point of the debate. The real purpose is to affect future bills. If favorable impacts are not achieved and bills remain too high, experienced clients stop arguing and take future business elsewhere.

6. **Counsel representing plaintiffs bill by the hour only in complex commercial litigation.** Litigation involving large commercial interests usually is conducted between large commercial enterprises. Those clients engage lawyers from within that client-defined market. The lawyers do not work on a contingent fee basis. The cases in which these lawyers become involved tend to involve lengthy pre-trial development of facts which occurred over long periods of time,

numerous experts in a variety of different fields, and, when tried, lengthy and legally complicated trials.

7. **With rare exceptions, excessive force cases are simple, rather than complex cases.** Excessive force cases almost always involve very few events which happened over a very short time span. There tend to be relatively few witnesses, and the dispositive disputes almost always involve the credibility of witnesses.

8. **There is no commercial market for plaintiffs' counsel charging hourly rates in simple cases.** Large commercial clients rarely become involved, as plaintiffs, in simple cases. Other kinds of clients, who do bring such cases, usually engage their lawyers exclusively on contingent fee bases.

9. **It is even more difficult for district courts than for commercial clients to question the reasonableness of specific hourly charges.** District judges do not have the implied threat of taking their business elsewhere to keep hourly charges down. District courts do not receive monthly bills, and cannot question time charges as they are incurred so as to slow down the rate of future charges. District courts are dealing with time alleged to have been already fairly spent. Much of the time included in the ultimate bill is ostensibly devoted to discovery and other pre-trial proceedings which district judges do not observe. As a result, even when it seems clear that the total number of hours charged is too high overall, judges have almost no articulable, legitimate basis upon which to determine that specific hourly charges are not reasonable.

10. **Requiring district courts to review the reasonableness of hours spent places district courts in an untenable position.** It is not hard for a judge relying on his or her own experience with similar cases to conclude that too many hours have been spent on particular matters.[6] Nor is it hard

---

**5.** The hourly rate is agreed to in advance. Any serious challenge of the attorney's hours almost inevitably turns into an attack as to the attorney's competence and/or his integrity. Either attack is too damaging to the attorney/client relationship to be pursued aggressively.

**6.** In a sense, the distinction between lawyers' charges that are "too high" and those that are

"reasonable" is not unlike what Justice Stewart said about the distinction between obscenity and pornography. It is easily recognized when observed, but hard to articulate to non-observers. *Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart J., concurring).

for a judge to draw conclusions concerning how much of a fee request should be reduced.[7] To justify a reduction of specific hours by reference to objective reasons, however, is extremely difficult. Such a reduction—without having had any opportunity to observe the hours being spent—is almost an implicit accusation that the lawyer is charging hours dishonestly or spending hours incompetently. Any such accusation, however made, inevitably places the judge in a completely untenable position with respect to future dealings with that attorney, especially if that attorney regularly appears before the court.

**11. The closest approximation to a commercial legal market for fee-shifting cases is the market represented by district court judges as clients, and lawyers whose practices depend in significant part on fee awards.** District court judges are very experienced at determining and paying "reasonable" attorneys fees. Judges are called upon to do so not only in civil rights cases, but also in a variety of other matters including the large number of criminal cases handled by CJA panel lawyers. All district court fee determinations, including those resulting in shifted fees, arise out of matters tried before them. As a result, district courts have a wealth of directly applicable experience in determining whether particular fee-shifting bills are reasonable.

**12. Requiring district court judges to use the lodestar formula significantly interferes with their ability to exercise their "client" knowledge and expertise.** District court judges have the relevant knowledge to make client-like comparisons of fee applications in excessive force civil rights cases. They also have the relevant knowledge to draw appropriate distinctions among the more common civil rights cases, and to differentiate them from cases involving large commercial interests.

---

**7.** The reported cases seem to reflect a practice among judges of reducing the hours paid for to a reasonable number by adopting percentage reductions. This practice, if it exists, eliminates the practical problems of specific analysis, but only by making the determination effectively unreviewable.

## FEE AWARD

■ Notwithstanding the foregoing, the court is constrained to undertake a lodestar analysis as the starting point for determining a reasonable fee in this case. In terms of its relative complexity, this case was a very typical excessive force case. It involved acts of excessive force done by two police officers to three young men during the course of a traffic stop. There were no permanent injuries and there was no wage loss. Accordingly, there was no expert testimony.

In their initial fee application, counsel compared their proposed hourly rate exclusively with the rates charged by others who practice in complex commercial litigation or other disparate fields. After being advised that the court did not deem this case to be complex, and instructed to produce evidence of hourly rates charged by plaintiffs for simple litigation, plaintiffs were unable to do so.[8]

> Counsel argues in its supplemental brief:
>
> By artificially attaching undue significance to the 'complexity' factor, the Court redefines § 1988, and places an unjustified burden on civil rights plaintiffs' counsel to evaluate any case in terms of 'complexity,' and the determine whether they are overqualified to accept it, on pain of being paid as if they have just come out of law school.

Plaintiffs' Supplemental Memorandum of Points and Authorities at 15 (emphasis omitted). This, however, is precisely what a commercial client, committed to pay for his or her own fees incurred, would do. Because the persons responsible for payment of the fees cannot protect themselves in advance, plaintiffs' counsel *must* make this evaluation or proceed at their peril.

Counsel supplied evidence of fees that he and others were paid as successful counsel in civil rights cases, and the hourly rate that these fees would represent if paid by the hour. Some of this evidence is evidence of what other judges have done in trying to

---

**8.** The court believes that small business law firms, on occasion, do bring simple lawsuits on behalf of their clients, and that they are paid on an hourly basis as plaintiffs counsel. Neither plaintiffs' counsel, nor defense counsel, however, have provided any such example.

apply lodestar, and other judicially-dictated reasoning, to the cases before them. No explanation is given of the nature of the cases, or any of the factors the judges may have considered in awarding the fees. The remainder is evidence of what counsel received in settlement of civil rights cases.

The court considers that the settlement amounts, which are agreed to by the party that ultimately pays them, are legitimate evidence of the proper hourly rate for lodestar purposes. The legitimacy is affected somewhat, however, by the fact that the settlements extinguished other liabilities in addition to the fee liability. Their value as evidence in this case is also reduced, because the court has not been provided with information about the underlying cases, or what factors the court considered in determining the fees.

The court has the utmost respect for counsel in this case. They did an outstanding job. In the court's judgement, their efforts definitely contributed to the size of the punitive damage award. But the case was not difficult. The plaintiffs and their families were perhaps the most attractive clients and witnesses this court has ever seen in an excessive force case. Their stories were consistent, credible and easily believed.

Taking these factors into account, the court analyzes the evidence as follows. The evidence indicates that the bottom level of the fee range for complex cases handled by lawyers of comparable training and experience is $250 per hour. Defendants have conceded that $200 per hour would not be excessive. In the aborted settlement of this case, defendants agreed to fees at a rate of $340 per hour.

The court finds that the range of reasonable hourly rates to be charged by a lawyer of comparable training and experience to try this case is between $200 and $300 per hour.

In choosing the appropriate point in that range, the court has considered the fact that even simple excessive force cases, because of their constitutional implications, must be regarded as significant. The court has also considered the fact that the punitive damage award represented an excellent result on the merits.[9]

Based upon the foregoing, the court finds that $250 per hour and $200 per hour are appropriate hourly rates to be paid to counsel Howard Price and Michael Adelson, respectively, for the work done in this very simple civil rights case. The difference in rates to be paid to the two counsel is based primarily on their relative contributions. Mr. Price was lead counsel in the case and performed most of the work. Mr. Adelson is being awarded a lower rate, not because he is a less skilled attorney, but because he made a smaller contribution to the successful prosecution of the case.

Here, defendants apparently do not contest the overall number of hours spent by plaintiffs' attorneys as unreasonable. Mr. Price has claimed 498.75 hours and Mr. Adelson has claimed 209.5 hours. Although the court finds that the hours are contestable, they are reasonable with reference to the total amount of the fee to be awarded.

Multiplying the reasonable rates by the number of hours spent in the case, the court determines that a reasonable fee is $124,687.50 for Mr. Price and $41,900.00 for Mr. Adelson.

Having reviewed the papers filed in connection with this matter, having heard oral argument, and being fully apprised of the relevant facts and law, IT IS HEREBY ORDERED that plaintiffs' motion for award of attorneys' fees be GRANTED. Attorneys' fees HEREBY ARE AWARDED in the amount of $124,687.50 to Mr. Price and $41,900.00 to Mr. Adelson, for a total of $166,587.50.

IT IS SO ORDERED.

---

**9.** The court refrains from comment on jury verdicts except where necessary to decision. The statement that the punitive damage award was an excellent result, should not be interpreted that the award was not fully justified.