Robert EDELMAN, et al., Plaintiffs,

v.

PSI ASSOCIATES II, INC., a California corporation, et al., Defendants.

No. CV 91–1324 JSL (Ex).

United States District Court, C.D. California.

Feb. 17, 1993.

Paul F. Bennett, David B. Gold—A Professional Law Corp., San Francisco, CA, for plaintiffs.

John A. Schwimmer, Michael Holtzman, Mindlin, Tigerman & Holtzman, Los Angeles, CA, for defendants.

## AMENDED ORDER GRANTING MOTION FOR PAYMENT OF PLAINTIFFS' ATTORNEYS' FEES AND EXPENSES

LETTS, District Judge.

The Motion of plaintiffs ROBERT EDELMAN, et al. for payment of plaintiffs' attorneys' fees and expenses came for hearing regularly on June 8, 1992.

Having reviewed the papers filed in connection with this matter, having heard oral argument and being fully apprised of the relevant facts and law, the court finds as follows.

## I. Facts

This case arose out of the conversion ("REIT Conversions") of certain limited partnerships sponsored by Public Storage, Inc. ("PSI") into real estate investment trusts ("REITs"). The limited partnerships that were converted into trusts all owned real properties. The general partner of each of the partnerships was either PSI, or PSI Associates II, a subsidiary of PSI. Plaintiffs Robert Edelman, Frank Sorrentino and Nancee Cortes brought this case on behalf of all persons who were limited partners in the limited partnerships at the time the vote was taken to reorganize them into REITs, alleging that the conversions violated the federal securities laws. They brought the action against the former general partners, the REIT entities and certain individuals.

The REIT Conversions changed the character of the former limited partners' investments from limited partnership interests, which would be liquidated upon the sale of the partnership assets and the distribution of the proceeds, to REIT beneficial trust interests in an ongoing pool of properties. The change in entity contemplated that, in the future, the proceeds from sales of trust assets would be reinvested rather than distributed to the holders of trust interests, and that the holders of such interests would liquidate their investments through sale in the market.

The REIT conversions required the vote of the limited partners of the various partnerships. The proposed terms of the conversions were first published to some of the limited partners, through prospectuses and proxy statements issued in October 1990.[1]

Dean Witter Reynolds, Inc., the investment banking firm which had distributed the original limited partnership interests, recommended that certain changes be made in the proposed terms for the benefit of the limited partners, and discussions were commenced with a view to agreeing upon certain amendments, which would be equally applicable to all limited partners. In December 1990, the general partners and Dean Witter reached an agreement on proposed amendments.

Also in December 1990, a group of individual limited partners filed a lawsuit in California state court, alleging the same basic causes of action asserted here.[2] That law-

---

1. As noted above, several limited partnerships were involved in the conversions. Prospectuses and proxy statements were mailed to limited partners who invested in certain of the limited partnerships at this time. Limited partners in other of the limited partnerships did not receive prospectuses and proxy statements until the spring of 1991.

2. Among other things, plaintiffs alleged violation of the security laws and breach of fiduciary duty

suit, *Carl Henrichson v. B. Wayne Hughes*, Case No. BC018029, was settled in February 1991, by an agreement which called for additional changes to the terms of the conversions, which were equally applicable to all limited partners.

Before the proposed new terms could be communicated to the limited partners to be voted upon, on March 12, 1991, plaintiffs' counsel, David B. Gold, a professional law corporation, (the "Gold firm"), filed this action on behalf of all the limited partners as a class. The Gold firm filed a duplicate action in California Superior Court.

Immediately after this lawsuit was filed, defendants advised the Gold firm of the earlier state proceedings, and indicated their willingness to consider further modifications of the terms of the conversions, before going forward with the REIT conversions. The Gold firm responded that it did not choose to participate in such discussions, and it went forward in Superior Court with a motion for a temporary restraining order to prevent the REIT Conversions from going forward. Only after this motion was denied on August 1, 1991, did the Gold firm express any willingness to discuss settlement of this action.

The parties apparently reached an agreement in late 1991, and this court approved the settlement on January 28, 1992. As part of the settlement, defendants agreed to pay plaintiffs' counsel reasonable attorneys fees and expenses, as determined by this court. The Gold firm has requested the amount of $750,000, which they contend represents a percentage of the future benefits conferred upon the class, or alternatively a "lodestar" amount, augmented by a multiplier of 2.3.[3] They also request expenses of $62,898.72.[4] Plaintiffs' counsel maintains that such a fee is appropriate in light of the value of the benefits allegedly bestowed upon the class of former limited partners by the settlement of

this litigation. Plaintiffs' counsel focuses primarily on alleged benefits resulting from provisions in the settlement agreement that impose additional restrictions on share repurchases by the REITs and require that defendants maintain distributions to shareholders at the maximum sustainable level. Counsel urges that the benefit of this provision to class members is more than $13 million in the first year alone and $40 to $70 million over the long term. In contrast, defendants maintain that $200,000 would be an appropriate award of attorneys fees and costs. This amount includes a "lodestar" determination of attorneys fees, in their estimate, without a multiplier.

### II. Legal Analysis

For the reasons set forth below, the court finds that $200,000 is a reasonable award of fees to plaintiffs' counsel, and awards that amount.

 A. *Plaintiffs' Counsel is Limited to an Award of Attorneys Fees in the Lodestar Amount since no Settlement Fund was Established*

 1. *Dague* controls the award of attorney fees in this case

Plaintiffs' counsel moves for substantial attorneys fees due to the alleged benefit it has brought to the plaintiff class. The first matter to be considered is the effect upon counsel's claim of the Supreme Court's recent decision in *City of Burlington v. Dague*, —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) which calls for a reasonable fee to be determined by the "lodestar" figure— reasonable hours multiplied by a reasonable hourly rate—without reference to the amount or nature of the recovery.

*Dague* and the line of decisions preceding it, by their terms, apply only to "fee shifting"

---

by the general partners in connection with the REIT conversions.

**3.** The "lodestar" figure is based upon "reasonable hours multiplied by a reasonable hourly fee." Plaintiffs' counsel asserts that this amount could be enhanced by a multiplier of 3 to 4.5 based on the benefit to the class from the settlement. They "only" request, however, a multiplier of 2.3.

**4.** In their May 11, 1992 memorandum in support of their petition for attorneys fees, plaintiffs' counsel requested $56,180.19 in expenses. By June 1, 1992, in their reply memorandum, plaintiffs' counsel's request for costs had escalated to $62,898.72.

cases where, by statute, the losing defendant is required to pay the "reasonable" attorneys fees to the prevailing plaintiffs. The court nevertheless believes that the *Dague* decision controls in this case since plaintiffs' counsel's request for attorneys fees involves an element of fee shifting.

The settlement agreement in this case does not provide for a "pool" of funds immediately payable to the plaintiff class, out of which plaintiffs' counsel is to be paid. Instead, the benefits of the settlement, if any, to the plaintiff class derive solely from the presumed increase in the class members' shares of expected future earnings of the defendant entities.[5]

Plaintiff's counsel does not propose to wait until the potential future benefits of the settlement are realized before receiving attorneys fees, nor does counsel contemplate that its fees will be paid only out of the increased share of future earnings that the class members will allegedly receive. On the contrary, counsel requests fees to be paid immediately by the defendant general partners, and out of funds of the defendant entities in which the defendant general partners have an interest. Counsel is to be paid out of funds in which the defendants have an interest *before* there

is any recovery at all for the benefit of the class. This is therefore essentially a fee shifting arrangement, and this court finds that the cases pertaining to the fee shifting statutes apply here.

### 2. *Dague* limits attorneys fees to a lodestar amount

Having determined that *Dague* controls counsel's claim for attorney fees, it becomes clear that the line of decisions culminating in *Dague* limits the Gold firm's fees to the lodestar amount. In *Blum v. Stenson,* a decision preceding *Dague,* the Supreme Court stated that the results obtained in litigation should not be, as the Gold firm wishes them to be in this case, an independent basis for enhancing the lodestar. 465 U.S. 886, 900, 104 S.Ct. 1541, 1549–50, 79 L.Ed.2d 891 (1989). In *Dague,* —— U.S. at ——, 112 S.Ct. at 2641, the Supreme Court indicated that the lodestar amount should only be enhanced in rare circumstances, and held that enhancement is not permitted for contingency, such as this case.[6]

This court has found that an exception to *Dague's* prohibition on enhancement in contingency cases exists in situations where a case is unattractive from the plaintiff's point of view. *See Gomez v. Gates,* 804 F.Supp. 69,

---

**5.** As discussed below, such earnings, of course, have yet to be realized, and there is no assurance as to how much, if any, of them will ever be realized.

**6.** Prior to *Dague,* the cases suggested that a "reasonable" attorneys fee award could be determined by reference to the *"Johnson* factors," which were set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). Under this analysis, a court might award fees based on a lodestar figure, enhanced by a multiplier, considering the *Johnson* factors. The *Johnson* factors are:

(1) The time and labor required ... (2) The novelty and difficulty of the questions ... (3) The skill requisite to perform the legal service properly ... (4) The preclusion of other employment by the attorney due to acceptance of the case ... (5) The customary fee ... (6) Whether the fee is fixed or contingent ... (7) Time limitation imposed by the client or the circumstances ... (8) The amount involved and the results obtained ... (9) The experience, reputation, and ability of the attorneys ... (10) The "undesirability" of the case ... (11) The nature and length of the professional relationship with the client ... (12) Awards in similar cases.

*Johnson,* 488 F.2d at 717–19.

In *Hensley v. Eckerhart,* the Supreme Court noted that many of the *Johnson* factors are normally subsumed within a lodestar figure, that is the calculation of reasonable hours times a reasonable hourly rate. 461 U.S. 424, 434, n. 9, 103 S.Ct. 1933, 1940, n. 9, 76 L.Ed.2d 40 (1983). In *Blum v. Stenson,* the Supreme Court held that the lodestar amount normally provides reasonable attorneys fees without enhancement by the lodestar amount, and identified some of the *Johnson* factors necessarily subsumed within the lodestar. 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Notably, the *Blum* court stated that the "results obtained" normally is subsumed within the lodestar amount and should not, as plaintiffs' counsel urges in this case be an independent basis for increasing the fee amount. *Id.* 465 U.S. at 900, 104 S.Ct. at 1549–50.

As discussed above, in *Dague,* the Supreme Court seemed to close off virtually all consideration of the *Johnson* factors, except as this court noted in *Gomez v. Gates,* 804 F.Supp. 69, 75 (C.D.Cal.1992), the "unattractiveness" of the particular case from the plaintiff's point of view.

75–77 (C.D.Cal.1992). The instant case, however, cannot fit within this holding because this case was very attractive from the standpoint of plaintiffs' counsel. Before taking this case, the Gold firm knew about both the Dean Witter negotiations and the *Henrichson* settlement, both of which were resolved favorably to the limited partners. Moreover, the Gold firm was invited by defendants to meet and discuss plaintiffs' concerns while defendants were still finalizing the *Henrichson* settlement. Defendants clearly indicated their preference to resolve all disputes at once, rather than through piecemeal litigation. Thus, it was virtually a foregone conclusion the matter could be resolved by settlement, and that the Gold firm would not be required to earn its fee by prevailing at trial. The fact that the Gold firm could only have perceived this case to be desirable distinguishes it from *Gomez*, and makes enhancement inappropriate.

### 3. The Cases Cited by Plaintiffs' Counsel for Enhanced Attorneys Fees Involved Class Action Settlement Funds

Plaintiffs' counsel points to two lines of cases in which plaintiffs' class-action counsel have been awarded fees substantially in excess of the lodestar by reference to the value of the benefits conferred upon the class, by virtue of counsel's efforts. In one strand of cases, of which *In re Businessland Securities Litigation*, [1991 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 96,059, at 90,336, 1991 WL 427887 (N.D.Cal.1991) is the most recent example, plaintiffs' class-action counsel were awarded fees which were a percentage of the plaintiff class recovery. *See also Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (in common fund cases, the Supreme Court approved determining "reasonable" attorneys fees based on a percentage of the amount recovered by the plaintiff class.) In the other line of cases pointed to by plaintiffs' counsel, of which *In re American Integrity Securities Litigation*, [1989–90 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,738, at 93,982, 1989 WL 89316 (E.D.Pa.1989) is an example, district courts have awarded fees which amount to a lodestar figure, augmented by a multiplier based on the favorable results to the plaintiff class. *See id.* (district court awarded attorneys fees of $1.5 million, based on counsel's determination of a lodestar figure and a multiplier of 2.5.) The Gold firm urges that the court follow one of these strands of precedent in its award of attorneys fees.

Plaintiffs' counsel's request, however, must fail. In the cases in which courts have awarded fees substantially in excess of the lodestar figure, the fees were paid directly from a settlement fund which had already been paid over by the defendants for the exclusive benefit of class members. For example, in *Businessland*, [1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,059, the court awarded thirty percent of a settlement fund of six million dollars as attorneys fees. In *American Integrity*, [1989–90 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,738, the court awarded an enhanced lodestar amount, which amounted to approximately twenty-three percent of a settlement fund. Counsel has cited *no* case in which class members received nothing but potential future benefits, but counsel received immediate payment of fees measured in any part by the value of the future benefits.[7]

The distinction between cases in which counsel is paid from a settlement fund and those in which counsel is paid on the basis of potential future benefits may at first appear meaningless, since it might seem easy enough for the parties in the latter circumstance to set up a settlement fund large enough to cover the fee—in this way, fitting within the pattern established by other cases. The court does not assume, however, that

7. Notably, in the two cases cited by plaintiffs' counsel in which the court awarded attorneys fees in the absence of a monetary recovery by the plaintiff class on the basis of the "substantial benefit" doctrine, there was no enhancement of the lodestar figure. In *Mills v. Electric Auto–Lite Company*, 396 U.S. 375, 394, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970), the Supreme Court merely held that plaintiffs who established a violation of the security laws should be reimbursed by the corporation for the costs of establishing the violation. The Supreme Court's language suggests that only the actual costs—a lodestar amount without enhancement—may be reimbursed. Similarly, in *Fletcher v. A.J. Industries, Inc.*, 266 Cal.App.2d 313, 72 Cal.Rptr. 146 (1st Dist.1968), the award of attorneys fees for $64,784 did not appear to be enhanced.

these knowledgeable and experienced class-action lawyers chose the course that they did because they did not understand the case law. The fact is that the defendants did *not* agree to set up a cash fund for the benefit of the plaintiff class. Understanding that there was serious disagreement over the amount of a reasonable fee, defendants negotiated an agreement, in which they, rather than the class members, would reap the benefit of any difference between the value placed by plaintiffs' counsel on their own services, and the value determined by the court.

B. *Plaintiffs' Counsel is Limited to an Award of Attorneys Fees in the Lodestar Amount since it is not Clear that the Settlement Agreement Substantially Benefits the Class*

■ Alternatively, even if *Dague* did not control, the Gold firm's claim for a substantially enhanced lodestar figure of attorneys fees is unavailing because it does not appear that the plaintiff class was substantially benefitted by the settlement agreement. First, the benefits plaintiffs' counsel claims the plaintiff class will receive necessarily inure over a substantial period of time, and are entirely dependent upon the future ability of the REITs to generate earnings from which distributions to investors can be made. There is, however, no assurance that any or all of the REITs in which the class members' own investments will be capable of generating any earnings from which distributions can be made. There is therefore no way to determine what value will be conferred upon the plaintiff class from the settlement, and no way to assess what a proper fee might be by reference to such a value.

Moreover, even if the future earnings of the REITs were not speculative, it would still be unclear that the plaintiff class receives a monetary benefit from the settlement. Indeed, the conclusion that the plaintiff class accrues any benefit from the settlement, other than the termination of the lawsuit and its attendant expenses, appears to rest on plaintiffs' counsel's misperception of the specific class whose interests must be advanced by its efforts.

The class which plaintiffs' counsel represented consists of those persons who were limited partners in the partnerships to be converted to REITs on the record date for the eligibility to vote on the conversions. Plaintiffs' counsel ignores the fact that this class is *not* the same as the class of persons who, through time, may own the REIT interests into which the partnership interests were converted. The distinction between these two classes is critical to a fair analysis of the benefit to the counsel produced by counsel.

As indicated above, after the REIT Conversions, sale of the REIT interests in the market was left as the only foreseeable means by which investors could liquidate their interests. The alternative of simply holding the interest until the partnership assets were sold, and receiving the net proceeds in liquidation, was eliminated. The REIT Conversions resulted in making the investment interests of the class plaintiffs who received REIT interests more readily marketable, but also more dependent on the market for the realization of the investment value.

In arguing the benefit they have conferred on the plaintiff class, plaintiffs' counsel has treated the plaintiff class as if it were the holders of REIT interests, whomever they may be from time to time in the future, rather than as that group of persons who held partnership interests in late 1990 and early 1991, who were eligible to vote on the REIT conversion.

Counsel's apparent assumption is that any trust interests that are not repurchased from class members directly by the REITs themselves will not be sold at all. There is no reason to believe that this assumption is correct. Since REITs do not liquidate when their assets are sold, and the usual way in which REIT interests are liquidated is through sale in the market, the better assumption is that *all* of the class members sooner or later will sell their interests. Counsel has completely ignored the benefit to *selling* class members of having the REIT itself helping to sustain a higher price for REIT trust interests than might exist if the REIT were not in the market.

Far more importantly, counsel has ignored the fact that its duty extends *only* to the original class members who remain *after* any sale of REIT interests. This is the critical weakness of counsel's analysis. Counsel's proof that the total distributions to the former general partners increase as the REIT purchases more REIT interests, and that total distributions to holders of REIT interests at the same time decrease, proves nothing. The relevant question is whether total distributions to *class members*—i.e. the former limited partners—increase or decrease. It cannot be shown that repurchases that result in benefits to the former general partners result in damages to class members who hold their REIT interests before and after the sale.[8] Instead, the repurchase results in each of the remaining class members having themselves a larger equity interest in the REIT.

### C. Calculation of the Lodestar

 Having concluded that the lodestar is the appropriate amount, the court turns to a determination of that amount. In determining the appropriate lodestar, the district court may exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary. *Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). In this case, much of the work performed by the Gold firm was excessive and unnecessary because a settlement might well have been reached early in the litigation, or even before the complaint was filed, had the Gold firm responded to the invitation of defendants' counsels to discuss plaintiffs' grievances. The court considers the number of hours defendants expended in defending this case to be a reasonable starting point for determining the hours component of the lodestar.

Through April 1992, counsel for the Public Storage defendants, Alschuler, Grossman and Pines, expended 760.25 hours for total fees of $150,146.25 (an average hourly rate of $197). Counsel for the independent directors and the REITs, Michael Holtzman, expended 155.5 hours for total fees of $37,320 ($240 per hour). Defendants' counsels' total fees amounted to $187,466.25 (915.75 hours at an average of $204 per hour). Defendants argue that in light of this figure, the Gold firm is entitled to no more than $200,000 in fees and expenses. The Court finds the $200,000 figure to be reasonable for the award of attorneys fees. It is $12,533.75 higher than defendants proposed lodestar; at the average hourly rate of $204, it allows for an additional 61 hours of time expended on the litigation. Since the Gold firm claimed a total of 1,426.5 hours, the court considers the 61 hour adjustment to be merited, and not a reward for unnecessary or duplicative work.

IT IS HEREBY ORDERED that the motion of plaintiffs Robert Edelman et al. is GRANTED. As previously ordered, this court awards attorneys' fees to the Gold firm in the total amount of $200,000, together with interest thereon from the date of the court's initial order, entered January 8, 1993, at 10% per annum until paid.

The court does not award plaintiffs' counsel costs at this time because it does not have before it appropriate supporting documents from plaintiffs' counsel justifying their costs.

IT IS SO ORDERED.

---

8. It is possible, of course, that REIT purchases could render the market illiquid, by taking too many shares out of it, but counsel does not assert that the narrower limit which it negotiated was calculated to assure significantly greater liquidity than would have existed otherwise.