**Albert ZUCKER, et al., Plaintiffs,**

v.

**OCCIDENTAL PETROLEUM CORP., et al., Defendants.**

**No. CV 91–0214 JMI(RCx).**

United States District Court, C.D. California.

June 4, 1997.

Joseph H. Weiss, Kevin J. Yourman, James E. Tullman of Weiss & Yourman, New York City, Jules Brody of Stull, Stull & Brody, New York City, for Plaintiffs and the Class.

Lawrence W. Schonbrun, Berkeley, CA, for Class Member and Objector.

## ORDER AWARDING ATTORNEY'S FEES

IDEMAN, District Judge.

LOS ANGELES

# Daily Journal

SERVING THE SOUTHERN CALIFORNIA
LEGAL COMMUNITY SINCE 1888

THURSDAY
JUNE 19, 1997

VOL 110 NO 118 • © 1997 DAILY JOURNAL CORPORATION ALL RIGHTS RESERVED • 915 EAST FIRST STREET LOS ANGELES CA 90012 (213) 229-5300 • OFFICIAL NEWSPAPER OF THE CITY OF LOS ANGELES AND THE COUNTY OF LOS ANGELES • $2

# Judge: Even Darrow Wasn't Worth $495/hr.

## Fee Award Slashed

**By Martin Berg**
Daily Journal Staff Writer

Even if Abe Lincoln, Clarence Darrow and other legal legends came back from the dead to form a law firm, they couldn't command the "eye-popping hourly rate" sought by attorneys who settled a securities fraud class action by shareholders against Occidental Petroleum, a federal judge said in a ruling.

In November 1993, U.S. District Judge James Ideman had approved nearly $3 million in legal fees to two law firms, Yourman & Weiss and Stull, Stull and Brody, when he approved the settlement.

One of the class members appealed to the 9th U.S. Circuit Court of Appeals, which approved the settlement, but sent the fee award back to Ideman because the judge "did not articulate its reasons for concluding that the plaintiff class received a substantial benefit and that $2.975 million is an appropriate amount of fees to award."

The second time around, Ideman changed his mind.

### Stinging Opinion

In a stinging 10-page opinion, the judge balked at Stull, Stull & Brody's $495 hourly rate and Weiss & Yourman's $465 hourly rate.

Ideman reduced the hourly rates to $375 an hour. He reduced the total amount of fees awarded from around $3 million to about $1.1 million.

The billing rates were "unnecessarily high, even given the complex nature of the case," Ideman ruled.

### 'Ridiculous Rate'

"Frankly no attorney is worth that much, even assuming the market were willing to bear such a ridiculous rate," Ideman said.

In a footnote, the judge said, "Even if the greats of legal history were to awaken from the dead and form their own mythical law practice, a senior partner at the firm Lincoln, Darrow, Holmes, Marshall & Blackstone would not be worth such an eye-popping hourly rate."

Questions to the law firms whose fees were reduced were referred to attorney James E. Tullman in the Los Angeles office of Weiss & Yourman, who declined comment.

But in a notice of a motion asking Ideman to reconsider his June 4 ruling, the firm's lawyers insisted their billing wasn't too high.

According to information they obtained only recently from the Lawyer's Almanac 1997, the firms state that a "high partner" at eight law firms in New York and Los Angeles who represent defendants in class actions were paid between $440 and $500 an hour last year. "While the court might believe that class counsel's hourly rates are high, [they] are consistent with hourly rates of defense counsel whose fees are paid on an hourly basis (as opposed to a contingent fee basis such as class counsel) and who do extensive defense work in this type of litigation, " the firms' lawyers contended in their motion, filed earlier this week.

Ideman said in his ruling that some of the work billed by senior counsel, such as

See Page 10 — AWARD

# Fee Award 'Ridiculous,' Judge Rules

Continued from Page 1

52½ hours of legal research, "most certainly could have been done by an associate at a lower rate."

In addition, Ideman questioned the benefits that attorneys for the class had been able to obtain for shareholders. Plaintiffs' attorneys had contended that Occidental Petroleum's stock rose as a result of the settlement. And two experts submitted declarations for the plaintiffs supporting that contention.

But Ideman labeled the plaintiffs' opinions "speculative at best." He noted that opponents of the settlement presented two opinions from two equally prominent experts, expressing the exact opposite opinion. "Simply put," the judge ruled, "there is no direct evidence that execution of the settlement agreement caused the increase in stock prices."

The 1991 class action, *Zucker v. Occidental Petroleum*, CV 91-0214 JMI, alleged that Occidental Petroleum committed securities fraud by cutting its dividend to $1 a share in January that year, shortly after telling shareholders the dividend wouldn't be cut from $2.50.

In earlier legal briefs filed in the case, the plaintiffs' attorneys defended the settlement and said its "great success" was a "direct result of the fact that plaintiffs were represented by lawyers who had extensive experience in litigating these types of cases."

Shareholders didn't get money from the settlement.

But the giant oil company agreed not to cut the dividend any further through 1997, as well as to make a 50 percent payout of "sustained earnings" if that amount exceeded $2 a share.

The attorney who represented the shareholder who objected to the settlement and fees, Berkeley sole practitioner Lawrence W. Schonbrun, is a longtime critic of attorneys in class action cases. In his challenge, he argued that the lawsuit brought no benefit to shareholders, only huge fees to their lawyers.

Schonbrun was especially critical of a provision of the settlement that he said would allow Occidental officials to ignore the terms of the settlement if they chose to. Plaintiffs' attorneys contended in a motion filed earlier that the settlement provided shareholders "with a heightened sense of security relative to their expectations of dividend returns."

On Wednesday, Schonbrun praised Ideman's ruling. "I'm very impressed that the judge, who had initially approved these much larger fees, was willing to conscientiously look at the facts and reevaluate his earlier position."

In earlier motions in the case, plaintiffs' lawyers have contended that Schonbrun is more interested in pushing his own financial and political agenda — alleging abuses by attorneys in class-action suits — than in getting relief for his client.

Schonbrun responded, "These guys are masters of redirection, and they will stop at nothing to attack the credibility of anyone who tries to shine public light on what it is they're up to in the courts."

---

**IT IS HEREBY ORDERED:**

Plaintiffs' Application for Attorneys' Fees in the amount of $2.975 million came before this Court on June 2, 1997. After careful review, considering all the arguments and materials presented by the parties, attorneys' fees are awarded in the amount of $1,151,527.80.

## BACKGROUND

This is a class action for securities fraud. Plaintiffs brought this action against Defendants Occidental Petroleum Corp. ("Oxy"), Ray Irani ("Irani", the CEO of Oxy), and Howard Collins (spokesman of Oxy). Plaintiffs alleged that Defendants made material misrepresentations of fact, assuring the public that Oxy would maintain its traditional $2.50 per share annual dividend payment to shareholders.[1] Plaintiffs claim that they relied on Defendants' false and misleading misrepresentations to their detriment in that the market price that they paid for the Oxy securities had been falsely inflated.

The parties entered into a Settlement Agreement ("Agreement"), which this Court approved. In the Agreement, Oxy guaranteed to pay a minimum $1 per share annual dividend up to 1997. Oxy also promised to make a fifty per cent payout of sustained earnings if that amount exceeded $2 per share. If the sustained earnings from 1993–95 amounted to less than $2 per share, the payout rate would be sixty per cent. All of these terms were subject to the Board's fiduciary obligations, business judgment, and its ability to enter into contrary contractual agreements in any financing.

This Court also approved an award of $2.975 million in attorneys' fees. The Ninth Circuit affirmed this Court's approval of the settlement but reversed on the issue of fees, as this Court did not "articulate its reasons for concluding that the plaintiff class received a substantial benefit and that $2.975 million is an appropriate amount of fees to award." To satisfy the Ninth Circuit's mandate, this Court ordered Plaintiffs' counsel ("Class counsel") to file a brief with the Court justi-

---

1. Led by CEO Armand Hammer until his death in 1990, Oxy had traditionally made annual dividend payments of $2.50 per share regardless of company earnings. When earnings could not sustain such a dividend (often they did not), assets had to be sold off to accommodate the payments. On January 14, 1991, Defendants announced a new policy in which dividend payouts would reflect fifty percent of earnings. That announcement triggered the instant litigation.

fying its fees. This Court then allowed class member Walter Kauffman ("Objector") to file a response. Plaintiffs have filed a Reply Memorandum.

## OBJECTOR'S STANDING

■ Class counsel first argues that Objector Kauffman does not have standing to challenge the proposed fee award. Article III of the United States Constitution requires that federal courts hear only cases and controversies before them. Accordingly, a party must have standing—an actual or threatened stake in the outcome of the controversy—to invoke federal judicial authority. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982). Such standing does not arise merely from one's status as a class member. To object to an award of attorneys' fees, the class member must be *aggrieved* by the proposed action. *In re First Capital Holdings Corp. Financial Prods. Secs. Litig.*, 33 F.3d 29, 30 (9th Cir.1994).

This issue, however, appears to have already been decided by the Ninth Circuit. While not expressly addressing this issue on appeal, the Court of Appeals heard Objector's arguments and ruled in part in his favor. Therefore, the Ninth Circuit implicitly recognized Objector's standing to challenge Class Counsel's request for attorney's fees.

## METHOD OF CALCULATION

Both Class counsel and Objector agree that the Ninth Circuit recognizes two methods for calculating attorneys' fees—the Lodestar/Multiplier Method and the Percentage Method. *See In re Washington Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291 (9th Cir.1994). When using the Lodestar/Multi-

plier Method, a court "calculates the 'lodestar' by multiplying the reasonable hours expended by a reasonable hourly rate." *Id.* at 1291 n. 2. "The court may then enhance the lodestar with a 'multiplier,' if necessary, to arrive at a reasonable fee." *Id.* In contrast, when using the Percentage Method, the court "simply awards the attorneys a percentage of the fund sufficient to provide plaintiffs' attorneys with a reasonable fee." *Id.* In either case, the fee ultimately awarded need only be reasonable under the circumstances. *Id.* Class counsel has attempted to justify its application for fees under both methods.

■ Class counsel urge this Court to adopt the Percentage Method in awarding fees.[2] In support of this argument, counsel has submitted the declarations of two expert witnesses who conclude that the terms of the proposed settlement added "substantial value" to Oxy shares. In particular, Roger F. Murray, Professor Emeritus of Banking and Finance at Columbia University's Graduate School of Business, notes that Oxy share prices rose from approximately $17 to $20, a capital increase of $900 million.[3] Further, Patrick J. Sheehan, a financial analyst with thirty years of experience, concludes that the settlement achieved by Plaintiffs' counsel amounts to between $87 million and $159 million in increased stock prices for members of the class.

In this case, however, it is inappropriate to award fees under the Percentage Method. First, no actual award of damages was created by this settlement. Therefore, there is no common fund from which a percentage can be drawn, making use of the Percentage Method impracticable. Second, while the credentials of experts Murray and Sheehan are impressive, their conclusions that the class received a "benefit" in the form of increased stock prices are speculative at

---

**2.** In cases where courts adopt the Percentage Method, the "benchmark" for fees is twenty-five per cent, which may be raised or lowered under appropriate circumstances. *See Torrisi v. Tucson Elec. Power Co.* 8 F.3d 1370, 1376 (9th Cir.1993). In this case, however, Class counsel's request for

$2.975 million in fees is just four percent of the "estimated" benefit conferred upon the class.

**3.** Professor Murray concedes that the rise in stock price is not solely attributable to the settlement, though he ultimately, concludes that the

best.[4] Not surprisingly, Objector was able to present two opinions from equally prominent experts asserting conclusions exactly opposite to those offered by Class counsel. Simply put, there is no direct evidence that execution of the Settlement Agreement caused the increase in stock prices. Therefore, this Court will use the Lodestar/Multiplier Method in calculating fees.

### MULTIPLIER

■ Class counsel, as part of its proposed award of attorneys' fees, requests that this Court adopt a multiplier of 2.13 to the Lodestar of $1,397,107.00, for a total award of $2.975 million. Multipliers are often imposed to reflect counsel's risk in taking on such protracted litigation or its deserved reward from the benefits it extracts for the class.

Objector cites to *City of Burlington v. Dague*, which proscribes the use of a multiplier in cases where the plaintiff prevails on a federal claim that mandates fee shifting. 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Objector also directs this Court to a case more directly on point, *Edelman v. PSI Assoc. II, Inc.*, 147 F.R.D. 217 (C.D.Cal. 1993)(Letts, J.). In *Edelman*, a class action securities case, the parties entered into a settlement agreement which did not provide a "pool" of funds payable to the class. Instead, the benefit to the class, if any, was to be derived from a presumed increase in the stock price from the settlement. U.S. District Judge Letts concluded that, although settlement precluded the possibility of the existence of a "prevailing" party, the agreement itself was essentially a non-statutory fee-shifting arrangement. As such, *Dague* applied to the case, precluding use of a multiplier.

The same analysis applies here in spite of Class counsel's vigorous attempts to distinguish *Edelman*.[5] First, this litigation was no more hotly contested than *Edelman*, as both cases settled without a trial on the merits or

a summary judgment motion. Second, the benefit allegedly conferred upon the class members in this case is still similarly questionable to that presumed in *Edelman*, as Class counsel has in this case failed to show that the increase in share value was *caused* by execution of the Settlement Agreement. Third, it is irrelevant that the defendants opposed the attorneys' fees in *Edelman*, as opposed to a class member here; the issue is whether a multiplier can properly be imposed on the lodestar, not who objects to the proposed imposition. Fourth, though imposition of a multiplier may be appropriate when the case is "unattractive" from plaintiffs' point of view, Class counsel has offered no evidence to indicate that this case was particularly unattractive at its inception. Fifth, Class counsel has also offered no evidence to indicate that use of a multiplier is "necessary" to determine the reasonableness of a fee. *See Guam Soc'y of Obstetricians and Gynecologists v. Ada*, 100 F.3d 691, 697 (9th Cir.1996). Counsel simply asserts the very general proposition that multipliers are imposed in certain cases, then offers the arbitrary multiplier of 2.13 to arrive at the conveniently round figure of $2.975 million.

Further, even if *Dague* did not operate to bar use of a multiplier in this case, such an imposition would be inappropriate. In all attorney fee cases, there exists a "strong presumption" that the lodestar figure represents the reasonable fee. *Dague*, 505 U.S. at 562, 112 S.Ct. at 2641. Imposing a risk multiplier would be inappropriate for the following reasons: (1) there is no evidence to suggest that Plaintiffs had difficulty obtaining counsel; (2) there is no evidence to indicate that Class counsel expected to receive an enhanced fee from a multiplier (as opposed to a contingent fee); and (3) Class counsel believed strongly in the merits of their Case. In fact, the only true risk to Class counsel was that of non-payment of fees. This is a risk that is inherent in any contin-

---

Settlement Agreement was a "significant" factor in the increased price.

4. Specifically, Mr. Sheehan concluded that shareholders received a benefit of between "approximately" $87 million and $159 million. This extraordinarily flexible estimate—a $72 million

gap—speaks volumes on the speculative nature of the expert's conclusions.

5. The applicability of *Dague* and *Edelman* are key here, as multipliers are not necessarily proscribed in "common fund" cases. *See Washington Pub. Power*, 19 F.3d at 1299.

gent fee agreement involving a complex case and can not, by itself, shake the strong presumption against imposing a multiplier.

Imposing a rewards multiplier would be especially inappropriate, as the Settlement Agreement did not provide for one dime of direct compensation to the class, nor did it substantially alter the duties of the Defendants. Though Class counsel argues that the Agreement substantially caused a boost in stock prices, this is pure speculation that was hotly disputed and is, as this Court has already stated, unpersuasive.

## REASONABLENESS OF HOURLY RATES

■ Objector also challenges the hourly rates charged by counsel, claiming that: (1) the rates themselves are inflated; and (2) failure by counsel to delegate tasks where appropriate resulted in an inflated fee bill. In computing the lodestar, the hourly billing rate to be applied is the hourly rate that is normally charged in the community where counsel practices, with the burden upon the fee applicant to establish local rates. *Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984). Also, to reflect the delay to Class counsel in recovering fees, this Court may use either current rates or historical rates with a prime interest rate enhancement. *Washington Pub. Power*, 19 F.3d at 1305.

■ Both of Objector's arguments here have merit. First, the billing rates of Class counsel are unnecessarily high, even given the complex nature of this case. The highest hourly rate for the firm Weiss & Yourman was $465.00. For the firm of Stull, Stull & Brody, the highest hourly rate was $495.00.

Frankly, no attorney is worth that much, even assuming the market is willing to bear such a ridiculous price.[6] More importantly, though, Class counsel has failed to offer evidence of current prevailing rates in the community. Therefore, this Court sets a top hourly rate of $375.00, thereby reducing counsel's base fee by $173,430.00 to $1,223,677.00.[7]

Second, it appears that some of the work billed by senior Class counsel should have been delegated to attorneys who charge at lower rates. For example, counsel Jules Brody billed 52.5 hours for legal research, a task that most certainly could have been tackled by an associate billing at a lower rate. Adjusting further the rate on these hours from $375 to $180 (the rate charged by associate Grace Keem), this Court reduces the proposed award an additional $10,237.50 to $1,213,439.50.[8]

## REASONABLENESS OF HOURS BILLED

■ Class counsel states that its fee request is proper not only based on the results achieved in the settlement but because of the amount of work expended in this case. Counsel claims to have spent more than 3,380 hours of time in the prosecution and settlement of this case. Objector challenges this number, arguing that counsel's numbers are "plainly excessive."

This was a fairly complex case, requiring a great deal of discovery and analysis, as well as intense settlement negotiations spanning several months. Except as otherwise stated herein, Class counsel justifies reasonable hours billed for the necessary tasks that accompany litigation such as this.[9]

---

6. Even if the greats of legal history were to awaken from the dead and form their own mythical law practice, a senior partner at the firm Lincoln, Darrow, Holmes, Marshall & Blackstone would not be worth such an eye-popping hourly rate.

7. By placing a cap at $375.00 per hour on the rates of attorneys Weiss, Yourman, and Brody, counsel's fees are respectively reduced by $72,337.50, $33,082.50, and $68,010.00. Aside from this cap, this Court adopts Class counsel's current fee rates to compensate for the extended and delayed nature of these proceedings.

8. Attorney Joseph H. Weiss also charged for 14.5 hours of legal research. Further reducing Weiss's rate on these hours from his capped hourly fee of $375.00 to $285.00 (that of attorney James Tullman), the fee is hereby reduced by another $1,305.00 to $1,212,134.50.

9. Objector challenges the number of hours worked, claiming that Class counsel's billings are excessive. Objector, however, offers no concrete examples of excess. To that extent, the number of hours billed are reasonable, especially given the complexity of the case.

There is, however, one notable problem. Class counsel billed by the quarter-hour, not by the tenth. Such a calculation-apparently harmless on its face-will over the course of litigation as complex as this add up to tens of thousands of dollars in unearned legal fees. It is within this Court's authority to reduce the lodestar for "unnecessary and duplicative" work. *Washington Pub. Power,* 19 F.3d at 1298. Further, this Court may reduce an award where the time records are "deficient." *Id.* at 1305–06 [10] In this case, Class counsel's inefficient billing scheme (though generally used in securities cases) is deficient because it does not reasonably reflect the number of hours actually worked.[11] Therefore, this Court reduces the adjusted fee by five per cent ($60,606.72) from $1,212,134.50 to $1,151,527.80.

### CONCLUSION

Accordingly, attorneys' fees are awarded to Plaintiff in the amount of $1,151,527.80.

**IT IS SO ORDERED.**

---

10.   If Class counsel were to move for reconsideration providing more detailed billing records, this Court would review those records and perhaps reconsider its ruling. *See Washington Pub. Power,* 19 F.3d at 1306.

11.   For example, assume that an attorney charging an hourly rate of $300.00 works for six minutes on a given matter. If that attorney bills by a tenth of an hour, the fee is $30.00 for those six minutes. If billed by the quarter-hour, the fee is $75.00, more than twice the fee for the same amount of work. Of course, this doesn't happen in every billing situation. Further, it would be unfair to Class counsel for this Court to reduce the lodestar by more than half, as the above example might suggest. Therefore, this Court adopts a five per cent reduction in the hope of: (1) more accurately reflecting the actual amount of work performed; and (2) promoting more efficient billing practices in complex litigation such as this.